Tongsun Park, Petitioner v. Commissioner of Internal Revenue, Respondent

Docket No. 3410–77.    Filed August 10, 1982.

*Sheldon S. Cohen, Henry G. Zapruder, Bradley S. Waterman,* and *Jeffrey Kurzweil,* for the petitioner.

*Stephen M. Miller* and *Christina M. Burkholder,* for the respondent.

Featherston, *Judge*: Respondent determined a deficiency in petitioner's Federal income tax and an addition to the tax under section 6654[1] for each of the years 1972, 1973, 1974, and 1975. The case is presently before the Court for the limited purpose of determining whether petitioner was a resident or nonresident alien during the years in question.[2]

## FINDINGS OF FACT

Petitioner was born on March 16, 1935, in the City of Sinchang, County of Sunchun, which is now part of the Peoples Republic of Korea (North Korea). He is, and at all relevant times has been, a citizen of the Republic of Korea (South Korea).[3] Petitioner has never filed a declaration of intention to become a citizen of the United States and has never filed a Form 1078 ("Certificate of Alien Claiming Residence in the United States"), or its equivalent, as referred to in section 1.871–4(c)(2), Income Tax Regs.

---

[1]All section references are to the Internal Revenue Code of 1954 as in effect during the tax years in issue, unless otherwise noted.

[2]On Aug. 23, 1978, the Court ordered that the issue of petitioner's residency, along with the issue of the sources and gross amounts of his income, be severed and tried separately from issues such as the deductions allowable to petitioner. The Court further ordered, on Apr. 13, 1981, that petitioner shall be entitled to prove at a subsequent trial, if any, that certain amounts were not income but were received by petitioner as an agent for others. Accordingly, although we have made general findings concerning the sources and amounts of petitioner's income, we have reserved the ultimate finding of the total amounts of his taxable income for each of the years in question.

[3]All further references to Korea denote South Korea.

Petitioner has at all times traveled only under passports issued by Korea. Under Korean law, there are three types of passports: general passports, official passports, and diplomatic passports. General passports are subdivided by purpose of trip into the following categories: business, cultural, dependent, visitor, study, employment, training, and permanent residence (i.e., immigration). At no time did petitioner enter the United States on a permanent residence passport.

## 1. *Education and Early Life in the United States (1952–63)*

On August 31, 1952, prior to completing high school in Korea, petitioner entered the United States in order to attend King College in Bristol, Tenn. In October 1953, petitioner left King College and went to Seattle, Wash., where he enrolled in Edison High School. Subsequently, petitioner became subject to efforts by the Immigration and Naturalization Service (INS) to deport him. On January 18, 1954, he filed an "Application to Extend Time of Temporary Stay." The application was denied, and a deportation order was issued. Upon graduating from high school, petitioner voluntarily left the United States on May 19, 1954, and thereby obviated enforcement of the deportation order.

Petitioner reentered the United States on September 13, 1955, in order to attend the College of Puget Sound in Tacoma, Wash. While attending that school, petitioner played violin in both the college orchestra and the Tacoma Symphony Orchestra. He also taught seventh and eighth grade Sunday school.

On August 20, 1956, petitioner enrolled in the Foreign Service Institute of Georgetown University (Georgetown). He attended Georgetown during each of the school years 1956–57, 1957–58, and 1958–59; during the summers of 1957, 1958, and 1959, he attended school in Mexico. During the 1960–61 school year, petitioner attended Fordham University for one or two semesters. He then returned to Georgetown for the 1961–62 school year and for the second semester (i.e., January through June 1963) of the 1962–63 school year. Petitioner received a bachelor of science degree in Foreign Service from Georgetown in June 1963.

On March 8, 1963, petitioner filed an "APPLICATION FOR CHANGE OF NONIMMIGRANT STATUS" from student[4] to visitor, stating as his reason: "Now that I finished my schooling, I wish to do the sight-seeing (take trip around the States)." Petitioner was informed by letter dated May 28, 1963, that he had been granted a change of status from F-1 (student) to B-2 (temporary visitor for pleasure) and an extension of stay until August 17, 1963.

### 2. Periods in United States (1964–75)

After the expiration of his B-2 visa in 1963, petitioner was issued a B-1 (temporary visitor for business) visa at least as early as August 28, 1964. The expiration date of this visa, and whether it was a single or multiple entry visa, is not shown on available records. On September 4, 1968, petitioner was issued a multiple entry E-2 (treaty investor) visa, and between that date and the latter part of 1971, he was in the United States on numerous occasions.[5]

---

[4]During his high school and college days, petitioner was issued single entry F-1 (student) visas except that he received two single entry B-2 (temporary visitor for pleasure) visas. His entries into, and departures from, the United States during the period of his schooling, so far as they are reflected in the record, are summarized in the table below:

| Type of visa | Date issued | Expiration date | Date of entry into U.S. | Date of departure |
|---|---|---|---|---|
| F-1 | Not available | Not available | Aug. 31, 1952 | May 19, 1954 |
| F-1 | Aug. 23, 1955 | Nov. 22, 1955 | Sept. 13, 1955 | Not available, but no later than June 10, 1957 |
| F-1 | Aug. 28, 1957 | Feb. 27, 1958 | Sept. 6, 1957 | Sometime prior to Feb. 5, 1958 |
| F-1 | Jan. 31, 1958 | July 30, 1958 | Feb. 5, 1958 | July 8, 1958 |
| B-2 | Aug. 12, 1958 | Feb. 11, 1959 | Aug. 21, 1958 | Sept. 1, 1958 |
| F-1 | Aug. 12, 1958 | Feb. 11, 1959 | Sept. 30, 1958 | Sometime between June 1, 1959 and Sept. 11, 1959 |
| B-2 | Sept. 17, 1959 | Mar. 16, 1960 | Sept. 19, 1959 | Sept. 23, 1959 |
| F-1 | Sept. 7, 1960 | Mar. 7, 1961 | Oct. 7, 1960 | Sometime prior to Feb. 9, 1961 |
| F-1 | Jan. 27, 1961 | July 27, 1961 | Feb. 9, 1961 | (¹) |

[1]The F-1 visa issued on Jan. 27, 1961, was periodically extended through Feb. 9, 1963.
[5]The following table shows entries and departures between Sept. 13, 1968, and July 1, 1971 (which may or may not be a complete list, see note 6 infra):

Petitioner was issued a multiple entry E–2 visa on October 27, 1971, and he was issued another multiple entry E–2 visa on August 10, 1972. The expiration dates of these visas are not shown on available records. On July 10, 1973, petitioner was issued a multiple entry B–1 visa which was valid through July 9, 1977. Pursuant to these three visas, petitioner entered and departed the United States during the period from December 18, 1971, through January 3, 1976, as follows: [6]

| Visa | Date of entry | INS departure date[1] | Date of actual departure | Number of days in U.S.[2] |
|---|---|---|---|---|
| E–2 Visa issued | 12/18/71 | 12/13/72 | 1/ 5/72 | 18 |
| Oct. 27, 1971 | 3/22/72 | 9/22/72 | 5/ 6/72 | 45 |
| | 5/16/72 | 5/15/73 | 6/30/72 | 45 |
| | 7/21/72 | 7/20/73 | 8/21/72 | 31 |
| E–2 Visa issued | 10/10/72 | 10/ 9/73 | 11/25/72 | 46 |
| Aug. 10, 1972 | 12/23/72 | 8/21/73 | 1/11/73 | 19 |
| | 1/16/73 | 8/21/73 | 2/25/73 | 40 |
| | 3/29/73 | 5/15/73 | 4/ 9/73 | 11 |
| | 4/ 9/73 | 5/15/73 | 4/17/73 | 8 |
| | 4/22/73 | 5/23/73 | 4/29/73 | 7 |
| | 5/16/73 | 8/30/73 | 6/24/73 | 39 |

| Date of entry into U.S. | INS departure date[1] | Date of actual departure |
|---|---|---|
| Sept. 13, 1968 | Sept. 12, 1969 | Oct. 8, 1968 |
| Nov. 21, 1968 | Not available | Dec. 25, 1968 |
| Sept. 30, 1969 | Sept. 29, 1970 | Oct. 24, 1969 |
| Oct. 29, 1969 | Oct. 29, 1970 | Nov. 1, 1969 |
| Dec. 9, 1969 | Dec. 8, 1970 | Jan. 7, 1970 |
| July 29, 1970 | July 28, 1971 | Aug. 30, 1970 |
| Oct. 27, 1970 | Apr. 30, 1971 | Not available |
| Dec. 13, 1970 | June 12, 1971 | Feb. 2, 1971 |
| June 6, 1971 | July 6, 1971 | July 1, 1971 |

[1] When an alien enters the United States under a nonimmigrant visa, such as an F–1, E–2, B–1, or B–2 visa, the INS authorities at the port of entry ask the purposes for the alien's visit and the length of stay necessary to accomplish those purposes. On the basis of this information and the restrictions on length of stay set forth in applicable statutes, regulations, rules, and operating manuals, the INS authorities determine the alien's permissible maximum length of stay, denoted in the above table as the "INS departure date."

[6] The information previously set forth with respect to petitioner's entries into and departures from the United States for years prior to 1972 does not necessarily constitute his only entries into and departures from the United States during those years. INS has no available information reflecting travel to the United States in addition to that set forth here for those years. However, the information pertaining to petitioner's entries into and departures from the United States for the years 1972 through 1975 is complete.

| Visa | Date of entry | INS departure date[1] | Date of actual departure | Number of days in U.S.[2] |
|---|---|---|---|---|
| B–1 Visa issued | 7/12/73 | 9/12/73 | 7/28/73 | 16 |
| July 10, 1973 | 9/10/73 | 3/10/74 | 9/28/73 | 18 |
| (valid through | 11/ 5/73 | 2/ 4/74 | 12/ 1/73 | 26 |
| July 9, 1977) | 12/ 8/73 | 1/15/73 [sic] | 1/ 5/74 | 28 |
| | 2/13/74 | Not available | 2/21/74 | 8 |
| | 2/25/74 | 5/16/74 | 3/ 5/74 | 8 |
| | 3/13/74 | 4/13/74 | 4/11/74 | 29 |
| | 6/ 4/74 | 12/ 3/74 | 6/17/74 | 13 |
| | 6/25/74 | 7/30/74 | 7/ 6/74 | 11 |
| | 7/16/74 | Not available | 9/ 2/74 | 48 |
| | 9/ 9/74 | 11/15/74 | 10/ 5/74 | 26 |
| | 10/ 8/74 | 11/15/74 | 10/19/74 | 11 |
| | 11/19/74 | Not available | 12/28/74 | 39 |
| | 12/31/74 | 1/20/75 | 1/ 4/75 | 4 |
| | 1/25/75 | 3/30/75 | 2/ 7/75 | 13 |
| | 2/13/75 | 4/18/75 | 3/27/75 | 42 |
| | 5/ 1/75 | Not available | 5/ 9/75 | 8 |
| | 5/11/75 | Not available | 5/15/75 | 4 |
| | 6/18/75 | Not available | 7/13/75 | 25 |
| | 7/15/75 | Not available | 7/19/75 | 4 |
| | 7/28/75 | 10/28/75 | 8/24/75 | 27 |
| | 9/ 6/75 | 11/15/75 | 9/18/75 | 12 |
| | 10/ 5/75 | Not available | 10/11/75 | 6 |
| | 10/31/75 | 12/10/75 | 11/ 9/75 | 9 |
| | 12/19/75 | 1/20/76 | 12/26/75 | 7 |
| | 12/31/75 | 1/ 5/76 | 1/ 3/76 | 3 |

[1] See note 5 supra.
[2] Counting the day of entry but not the day of departure.

Not counting the days of his departures, petitioner spent the following total number of days in the United States during each of the years in question:

| Year | Number of days |
|---|---|
| 1972 | 180 |
| 1973 | 199 |
| 1974 | 198 |
| 1975 | 161 |

In comparison with his stays in the United States, petitioner entered and departed Korea during the years 1972 through 1975 as follows:

| Date of entry | Date of departure | Number of days in Korea[1] |
|---|---|---|
| **1972** | | |
| Jan. 7 | Jan. 12 | 5 |
| Jan. 18 | Feb. 22 | 35 |
| Feb. 24 | Mar. 22 | 27 |
| May 7 | May 18[2] | 11 |
| July 1 | July 19 | 18 |
| Aug. 22 | Oct. 10 | 49 |
| Nov. 26 | Nov. 30 | 4 |
| Dec. 12 | Dec. 22 | 10 |
| | | 159 |
| **1973** | | |
| Feb. 27 | Mar. 22 | 23 |
| Mar. 25 | Mar. 28 | 3 |
| Apr. 19 | Apr. 22 | 3 |
| Apr. 30 | May 2 | 2 |
| May 5 | May 6 | 1 |
| May 8 | May 15 | 7 |
| June 25 | July 12 | 17 |
| July 31 | Aug. 6 | 6 |
| Aug. 8 | Sept. 8 | 32 |
| Oct. 17 | Oct. 18 | 1 |
| Oct. 21 | Oct. 26 | 5 |
| Oct. 30 | Nov. 4 | 5 |
| Dec. 3 | Dec. 7 | 4 |
| | | 109 |
| **1974** | | |
| Jan. 9 | Jan. 16 | 7 |
| Jan. 19 | Jan. 24 | 5 |
| Mar. 6 | Mar. 13 | 7 |
| Apr. 13 | Apr. 17 | 4 |
| Apr. 21 | Apr. 22 | 1 |
| Apr. 24 | May 13 | 19 |
| May 17 | May 24 | 7 |
| May 28 | June 2 | 5 |
| June 22 | June 25 | 3 |
| July 7 | July 15 | 8 |

| Date of entry | Date of departure | Number of days in Korea[1] |
|---|---|---|
| Sept. 3 | Sept. 4 | 1 |
| Sept. 4 | Sept. 9 | 5 |
| Oct. 20 | Oct. 27 | 7 |
| Oct. 31 | Nov. 7 | 7 |
| Nov. 9 | Nov. 18 | 9 |
| | | 95 |
| | **1975** | |
| Jan. 5 | Jan. 7 | 2 |
| Jan. 9 | Jan. 15 | 6 |
| Mar. 28 | Mar. 31 | 3 |
| Apr. 4 | May 1 | 27 |
| May 21 | May 26 | 5 |
| May 28 | June 5 | 8 |
| June 9 | June 13 | 4 |
| July 23 | July 28 | 5 |
| Aug. 25 | Aug. 30 | 5 |
| Sept. 3 | Sept. 6 | 3 |
| Oct. 13 | Oct. 14 | 1 |
| Oct. 16 | Oct. 26 | 10 |
| | | 79 |

[1] Counting the day of entry but not the day of departure.

[2] This date of departure from Korea conflicts with the May 16, 1972, date of entry into the United States shown in the previous table. Both dates are derived from stipulated exhibits. Because the record contains no basis for resolving and the parties have raised no question concerning this conflict, we have accepted both dates as shown in the exhibits and stipulation.

### 3. Business and Investment in the United States

In the early 1960's, petitioner began organizing, financing, and managing, directly or through employees, business and investment activities in the United States. These activities continued at an increasing rate throughout the years in question.

### A. Suter's Tavern and the George Town Club

On October 5, 1960, Suter's Tavern (Suter's) was incorporated under the laws of the District of Columbia with 409 shares of common stock issued and outstanding. Petitioner acquired these 409 shares of stock by purchase as follows:

| Date | Number of shares purchased | Price paid |
|------|----------------------------|------------|
| May 23, 1961 | 100 | $25,000 |
| April 1964 | 300 | 75,000 |
| June 21, 1965 | 5 | Unknown |
| May 1975 | 4 | Unknown |

An additional 20 shares of Suter's stock were issued to petitioner on July 1, 1975, and at that time he canceled a $200,000 loan that he had made to Suter's. From that point through March 31, 1978, petitioner owned all of the issued and outstanding stock (i.e., 429 shares) of Suter's. He became a director of Suter's in 1962 and its president in 1964.

On June 7, 1965, Suter's purchased the building and land located at 1530 Wisconsin Ave., N.W., Washington, D.C. (the 1530 property). To finance the purchase of this property, Suter's and petitioner, as co-makers of a note, obtained a $325,000 first mortgage loan from the Philadelphia Life Insurance Co. In addition to the mortgage on the 1530 property, the collateral for the loan included a pledge of petitioner's stock in Suter's and of an insurance policy on petitioner's life, dated May 13, 1965, in the amount of $300,000.

On March 24, 1961, the George Town Club at Suter's Tavern, Inc. (the George Town Club), was incorporated by Donald A. Brown, Francis Alspach, and Paul Enten under the District of Columbia Non-Profit Corporation Act. The club was formed for the following purposes:

To cultivate social intercourse among those residents of the Georgetown section of Washington, D.C., and those persons interested in the Georgetown section of Washington, D.C., and, to promote the exchange of knowledge and ideas among persons engaged in the arts and related fields, and those interested in the arts; to foster trade and commerce and cultural exchange among its members and to buy, lease, and/or maintain a clubhouse or club rooms for the use, entertainment and refreshment of its members and guests, to the extent permitted by law and the by-laws of the corporation.

Petitioner became one of the prime movers and founding members of the George Town Club, along with other political, military, business, and social leaders in Washington, D.C. During the period January 12, 1966, through April 12, 1966, charter membership in the George Town Club was offered to a select group of persons, including prominent individuals in

business, government, and the military. There were 66 persons, including petitioner, who became either founding or charter members. The George Town Club officially opened on March 15, 1966. Petitioner continued to maintain his membership in it at least through the time of trial.

Under an agreement entered into between Suter's as landlord and the George Town Club as tenant, Suter's rented the 1530 property to the George Town Club for a term of 25 years commencing September 1, 1965, and ending August 31, 1990. The George Town Club covenanted to pay rent and to use the premises only for its private, nonprofit purposes. In addition to leasing the 1530 property to the George Town Club, Suter's, the stock of which petitioner owned all but four shares, agreed to manage the restaurant activities of the George Town Club as follows:

> In consideration of the rental herein reserved to be paid by tenant, landlord covenants and agrees to provide, at its own cost and expense, all personnel reasonably required for the successful operation of the said recreational facility to be known as The George Town Club, including, but not limited to club manager, maitre d'hotel, chef, waiters, bartenders, busboys, kitchen help, and other such personnel as may be agreed upon by the parties from time to time dependent upon the use of the said facilities. The failure of landlord to provide such personnel, after written notice, shall entitle tenant to hire such additional personnel as may be required, and to deduct the reasonable costs thereof from any rental, either past or future, which may be or become due to landlord.

> Landlord herein reserves the right to operate, at its own expenses and for its exclusive benefit, all concessions for food, beverage, bar, cigarettes, hat and coat check and any other services ordinarily required.

On June 15, 1971, Suter's and petitioner leased certain property contiguous to the 1530 property for a period of 3 years. That property was then subleased to the George Town Club for expansion of its operations.

Petitioner did everything that he could to make the operation of the George Town Club successful. In this connection, Suter's paid utility bills, taxes, and insurance premiums for which the George Town Club was liable under the lease agreement but was unable to pay. By 1978, Suter's had paid a total of $300,000 in such expenses for the George Town Club; in addition, the George Town Club owed Suter's $40,000 in back rent. In 1978, Suter's forgave this entire $340,000 indebtedness of the George Town Club.

Suter's derived income from rent paid by the George Town Club for the 1530 property and from food and bar sales generated by the George Town Club. The day-to-day operations of Suter's were managed by Norman Larsen, who was also the secretary of the George Town Club. Petitioner participated in the major financial decisions involving Suter's, including the acquisition of equipment, furniture, and real property, but he did not concern himself with its daily operations.

With respect to his investment in Suter's, petitioner consulted from time to time with Frank Frantz (Frantz), a certified public accountant retained by Suter's beginning in 1967. Frantz advised petitioner to invest funds in Suter's during its formative stage, because the real estate owned by Suter's was a good investment and because its business with the George Town Club was increasing and would be profitable in the future.

As of October 31 of the years 1972 through 1975, Suter's financial statements reflected, among other items, the following:

|  | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Total assets | $657,465 | $643,094 | $618,957 | $610,585 |
| Loans from petitioner | 483,509 | 418,912 | 370,066 | [1] 10,195 |

[1] As previously noted, petitioner canceled $200,000 of Suter's indebtedness to him on July 1, 1975, in exchange for 20 shares of stock. Also, during 1975, Suter's executed a promissory note in favor of Pacific Development, Inc. (PDI, *infra*) which, by an agreement between Suter's PDI, and petitioner, replaced $150,000 of Suter's indebtedness to petitioner.

## B. *PDI*

Pacific Development, Inc. (PDI), was incorporated under the laws of the District of Columbia on April 1, 1968. It was organized to serve as a consultant and "matchmaker" to various American firms interested in trade and investment opportunities in Korea and Formosa. Petitioner was PDI's president and sole shareholder from the date of its incorporation through at least March 31, 1978, as well as its treasurer for at least a portion of this period.

PDI was dormant until 1973 and did not become a viable commercial entity until 1975. Once PDI became an active corporation, petitioner participated in making all major corporate decisions.

In 1973 and 1974, the corporate office of PDI was located in

the basement of petitioner's house at 1713 22d Street, N.W., Washington, D.C. On January 2, 1975, PDI purchased an office building located at 1604 K Street, N.W., Washington, D.C. (the K Street building), for $400,000; petitioner personally guaranteed a $225,000 first mortgage given in connection with the purchase of the property. Petitioner had an office in the K Street building which he used infrequently to attend meetings.

On August 29, 1974, petitioner personally applied to the Riggs National Bank for a $30,000 mortgage loan to purchase a house and lot at 2233 N. Lexington Street, Arlington, Va. PDI purchased that property for $43,000 on September 25, 1974; it sold the property for $48,000 on October 6, 1975.

On September 26, 1974, PDI purchased a house located at 9124 River Road, Potomac, Md., from ex-Congressman Richard Hanna for $225,649. The house was purchased in large part for reasons personal to petitioner. Although the contract for the purchase of the house was between Hanna and petitioner, title to the property was placed in PDI's name at least partially for tax purposes. The house was sold for $232,000 on October 24, 1975.

On February 5, 1975, petitioner entered into an agreement to loan $500,000 to International Oil & Gas Corp. (IOG), a corporation based in Dallas, Tex., in exchange for a promissory note with the right to convert the note to stock in IOG. Petitioner's rights and obligations under the agreement were later transferred to PDI, and on March 10, 1975, PDI's board of directors, with petitioner present, authorized a loan to IOG in the sum of $500,000. Subsequently, that amount was withdrawn from petitioner's checking account in the Bank of Bermuda and deposited in his checking account at the Equitable Trust Bank, Baltimore, Md. (Equitable Trust). Immediately thereafter, the money was withdrawn from petitioner's account with the Equitable Trust and deposited in PDI's checking account with the National Bank of Washington, D.C. (the National Bank). On March 26, 1975, PDI loaned the $500,000 to IOG, and on May 1, 1975, PDI executed a non-interest-bearing note in favor of petitioner in the amount of $500,000. On October 8, 1976, PDI exercised the option to convert the note from IOG into stock of that corporation. Petitioner became a member of the board of directors of IOG.

Under an agreement dated July 31, 1975, PDI purchased 30

percent of the authorized shares of stock (actually issued in petitioner's name) in Wide World of Travel, Inc. (Wide World), for $37,500. In addition, PDI loaned Wide World $37,500 on the same date. Wide World, a domestic corporation, operated a travel agency located in the Baltimore, Md., area. After the investment in Wide World was made by PDI, a branch office of Wide World was opened in the K Street building owned by PDI. PDI sold its Wide World stock on September 29, 1978.

In 1975, petitioner was approached by a friend, former Congressman Cornelius Gallagher, concerning a business opportunity involving hogs. Petitioner directed Spencer Robbins (Robbins), an employee of PDI, to evaluate the investment opportunity. Robbins and other staff members of PDI recommended against the investment, but petitioner disregarded that advice and directed that the investment be made. For this purpose, Lambus, Inc., was formed as a wholly owned subsidiary of PDI. Petitioner and PDI staff members attended meetings in connection with the Lambus investment, but petitioner did not participate in the management of Lambus, Inc.[7]

---

[7] In *Valley Finance, Inc. v. United States*, 629 F.2d 162 (D.C. Cir. 1980), a case involving the propriety of an Internal Revenue Service seizure of PDI's assets based on a jeopardy assessment against petitioner for the taxes in question in this case, the court, in upholding a decision of the District Court that PDI was "a mere instrumentality" of petitioner, stated in part as follows (at 172–173; all references to "Park" and "Pacific" are to petitioner and PDI, respectively):

"Park founded Pacific in 1968, and was its president and sole shareholder on a continuous basis thereafter. Despite protestations in the record, there is no evidence that a major corporate decision was ever made by anyone other than Park. The Board of Directors played no meaningful role. There is serious doubt as to whether a Board existed at all prior to December, 1974. After that date, directors met infrequently. When they did meet, Board members approved corporate decisions and policies without discussion or question. Many purported meetings consisted of brief telephone conversations. Individual officers performed ministerial functions at the behest of the president. They exercised no significant discretionary authority. The conclusion that board members neither controlled nor influenced corporate affairs is amply supported.

"It is equally apparent that Park used corporate funds and staff for his own private purposes on a regular basis. He wrote checks on Pacific's bank accounts to cover unrelated personal and business expenses. Pacific employees served as Park's chauffeur, managed his domestic staff, entertained his guests, and ran other personal errands for him, often of an elaborate international nature. They spent substantial amounts of time, at his behest, on these various personal matters. Pacific provided similar administrative and managerial services to assist Park in other business ventures. The record sufficiently establishes that the corporation operated primarily, if not exclusively, to perform staff functions for its founder and sole shareholder.

"This conclusion is further supported by substantial evidence that Park manipulated the few ventures in which Pacific was involved in order to advance his own distinct business or

For the years 1973 and 1974, PDI reported taxable losses on its Form 1120, Corporation Income Tax Returns, in the respective amounts of $3,831 and $108,163. For 1975, PDI's balance sheet showed a net loss of $511,364; as of December 31, 1975, PDI's books showed an accumulated capital deficit of $605,879. As of December 31 of the years 1974 and 1975, PDI's financial statements reflected, among other items, the following:

|  | *1974* | *1975* |
|---|---|---|
| Total assets | $678,907 | $2,104,577 |
| Loans from petitioner | 169,053 | 2,187,838 |
| Common stock | 252,000 | 265,000 |

C. *Pisces Club and 3040 M Street Corp.*

In late 1974 or early 1975, petitioner was presented with an investment opportunity by Peter Malatesta and C. Wyatt Dickerson, who were interested in forming a private club. Petitioner decided to make the investment. On May 1, 1975, petitioner, Dickerson, and Malatesta executed a "MEMORANDUM OF UNDERSTANDING" providing that two corporations would be created in connection with the establishment of the club. The agreement contemplated that one corporation would serve as the club and the second corporation would perform management services for the club. Petitioner agreed to purchase 80 percent of the initial stock of the management corporation for $40,000 cash; the remaining stock was to be purchased by Dickerson and Malatesta (10 percent each) for $5,000. In addition, petitioner was to loan $250,000 to the management corporation at 1 percent per month. Malatesta was to have the principal responsibility for the organization and operation of the club.

On May 27, 1975, the Pisces Club, named for petitioner's astrological sign, was incorporated under the District of Columbia Non-Profit Corporation Act; petitioner was one of its

---

financial interests. To this end, he assigned profits from work performed by Pacific either to himself or to other companies. He forgave bad loans made to influential figures with Pacific funds. He also assigned funds to Pacific for ventures in which the corporation had played no part. By persistently exercising control over the assignment of profits and payments, Park effectively used Pacific as an incorporated pocketbook. In short, the record is replete with evidence that the corporation was fundamentally an extension of its taxpayer-owner."

founding members. Two days later, the 3040 M Street Corp. (the M Street corporation) was incorporated under the laws of the District of Columbia. Petitioner acquired 80 percent (80 shares) of the issued and outstanding stock of the corporation for $40,000. On April 24, 1976, 14 shares of that stock were transferred to Dickerson, reducing petitioner's percentage ownership in the M Street corporation to 66 percent. Petitioner designated Spencer Robbins, an employee of PDI, to oversee his investment in the M Street corporation. Petitioner's stock interest in that corporation terminated in early 1978.

As contemplated in the May 1, 1975, "MEMORANDUM OF UNDERSTANDING," the M Street corporation was formed to provide management services and act as landlord to the Pisces Club. In this connection, the M Street corporation leased the property located at 3040 M Street, N.W., Washington, D.C., for a term of 10 years with two 5-year renewal options. This property was then subleased to the Pisces Club.

On May 12, 1975, Spencer Robbins, on behalf of petitioner, applied for a $200,000 loan from the National Bank for the purpose of assisting in the financing of the Pisces Club. The effective date of the loan was to be September 1, 1975, and it was to be in petitioner's name, individually.

On July 17, 1975, the board of directors of PDI authorized a loan to the M Street corporation of sums up to $350,000. Spencer Robbins was authorized to make such loans and accept promissory notes on behalf of PDI, and petitioner directed Robbins to appropriate the funds for that purpose.

On March 24, 1976, petitioner executed a collateral security agreement pledging a $30,000 certificate of deposit with the National Bank to secure loans made by that bank to the M Street corporation. On July 23, 1976, petitioner guaranteed the payment of all loans made to the M Street corporation by the National Bank. On April 10, 1977, petitioner executed a collateral security agreement pledging a $100,000 certificate of deposit with the National Bank to secure loans made by that bank to petitioner or the M Street corporation.

D. *Valley Finance Corp.*

On July 25, 1975, petitioner acquired all of the stock of Valley Finance Corp. (Valley Finance), a loan company, which he continued to own through March 31, 1978. Petitioner's

investment in Valley Finance was between $100,000 and $150,000; he was the president and a director of the corporation. Richard Staples, a friend of, and financial consultant to, petitioner, was the vice president, secretary, and a director of Valley Finance. Staples was responsible for the day-to-day operations of Valley Finance, which made a total of only five or six loans ranging from $5,000 to $50,000.

E. *Diplomat National Bank*

In 1975, petitioner purchased 10,000 shares of stock in the Diplomat National Bank (Diplomat Bank) at a cost of $250,000. He purchased this stock in the name of nominees, as follows:

| *Number of shares* | *Cost* | *Nominee* |
| --- | --- | --- |
| 3,320 | $83,000 | Richard L. Staples |
| 3,320 | 83,000 | Milton G. Nottingham |
| 3,360 | 84,000 | Spencer E. Robbins |

Petitioner drew checks on his personal account in the Industrial Bank of Japan, New York, N.Y., in favor of each of the nominees in the appropriate amounts of the stock purchases. The opportunity to invest in the Diplomat Bank was brought to petitioner's attention by Dr. Charles Kim, a friend and one of the bank's organizers.

### 4. Business and Investment in Korea

At approximately the same time that petitioner began pursuing business and investment activities in the United States, he became involved with similar activities in Korea. As in the case of his activities in the United States, petitioner's business and investment activities in Korea continued at an increasing rate throughout the years in question.

A. *Miryung Sangsa Co., Ltd.*

By the time that he graduated from Georgetown, petitioner was on the board of directors of Miryung Sangsa Co., Ltd. (Sangsa), a Korean corporation established by his father on February 12, 1953, and owned solely by members of petitioner's family. Petitioner had acquired 30 percent of the stock in

Sangsa on March 28, 1962, through inheritance from his father.

Sangsa has engaged in the business of distribution (wholesale and retail), transportation, and storage of petroleum products, in the import-export business, and in the business of trucking special cargoes. Petitioner served on Sangsa's board of directors until July 28, 1970, and he was the president of Sangsa from March 10, 1969, to July 28, 1970. Petitioner sold all of his shares in Sangsa on July 2, 1973, for 78 million won (approximately $195,000).

## B. *Pan Ocean Bulk Carriers, Ltd.*

During the years 1965 through 1968, petitioner assisted his brother in establishing one of the first major shipping companies in Korea, Pan Ocean Bulk Carriers, Ltd. (Pan Ocean). In this connection, they engaged in negotiations with Gulf Oil Corp. and had dealings with various officials of the Korean Government. Petitioner entertained various individuals in order to advance Pan Ocean's business interests. In May 1968, petitioner communicated with Richard Staples concerning the establishment of a banking relationship between the Equitable Trust Bank, Baltimore, Md., and Pan Ocean. During the years 1972 through 1975, petitioner rendered consulting services to Pan Ocean, receiving compensation as specified in the table on page 270 *infra*.

## C. *The "Miryung Group"*

Petitioner had interests in a cluster of corporations referred to as the "Miryung Group." Among them, Miryung Moolsan Co., Ltd. (Moolsan), was incorporated under the laws of Korea on August 14, 1970. Petitioner was the sole shareholder of Moolsan, and during the years 1972 through 1975, he served as its president and "representative director."[8] During those years, Moolsan engaged in the business of representing non-Korean firms that provided technological services or sold goods in Korea and was in the business of exporting Korean

---

[8]The representative director of a Korean corporation is elected by, and from the directors of, the corporation. The representative director is empowered to represent the corporation with respect to all matters except those which are statutorily reserved to the board of directors or shareholders.

goods to other countries. Moolsan's clients included a large number of corporations located in the United States, as well as corporations located in France and Japan.

Miryung Tongsang Co., Ltd. (Tongsang), was incorporated under the laws of Korea on April 29, 1971. Petitioner served as the president and representative director of Tongsang, and was its sole shareholder, from 1974 through November 28, 1977. Tongsang engaged in the business of quarrying, cutting, finishing, and exporting (mainly to Japan) stone and stone products from two quarries located in Korea. It became one of the largest Korean exporters of limestone to Japan.

Tongsang's gross income, average number of employees, and the book value of its assets for 1971 through 1977 were as follows:

| Year | Gross income | Average number of employees | Book value of assets as of Dec. 31 |
|------|------|------|------|
| 1971 | 0 | Unknown | $28,754 |
| 1972 | $32,006 | 2 | 32,577 |
| 1973 | 22,680 | 3 | 27,538 |
| 1974 | 343,349 | 15 | 209,814 |
| 1975 | 2,059,793 | 12 | 1,970,419 |
| 1976 | 3,099,244 | 14 | 708,225 |
| 1977 | 272,612 | 11 | 560,074 |

Tongsang's paid-in capital for 1974 through 1977 was as follows:

| Year | Paid-in capital as of Dec. 31 |
|------|------|
| 1974 | $61,983 |
| 1975 | 123,967 |
| 1976 | 289,256 |
| 1977 | 289,256 |

Miryung Navigation Co., Ltd. (Navigation), was organized under the laws of Korea on November 13, 1973. Petitioner served as the president and representative director and was the sole shareholder of Navigation from the time of its incorporation through November 29, 1977. During 1974 and 1975, Navigation owned four oil tankers and two log carriers, all of which were leased under time charter agreements to Japan Line, Ltd. (Japan Line); Navigation operated, manned,

and performed administrative services with respect to those vessels for Japan Line. Beginning in early 1975, Navigation served as an agent for shipping companies and provided administrative services for vessels owned by non-Koreans. Navigation also chartered ships into, and out of, Korea, and it engaged in the ship brokerage business. Petitioner participated in securing some of Navigation's business by, for example, meeting with representatives of Mobil Shipping Co., Ltd., in New York.

Navigation's gross income, average number of employees, and the book value of its assets for 1973, 1974, 1975, 1976, and 1977 were as follows:

| Year | Gross income | Average number of employees | Book value of assets as of Dec. 31 |
|---|---|---|---|
| 1973 | 0 | 12 | $3,433,444 |
| 1974 | $2,259,998 | 169 | 10,307,415 |
| 1975 | 6,251,174 | 278 | 9,392,940 |
| 1976 | 5,550,450 | 299 | 9,346,818 |
| 1977 | 3,072,514 | 240 | 7,760,083 |

During the early and mid–1970's, Moolsan, Tongsang, and Navigation occupied four floors of the Jaebun Building, 5, Yang-Dong, Chung-Ku, Seoul. In November 1977, Moolsan and Tongsang were merged into Navigation, which changed its name to Miryung Moolsan Corp.

## D. *Hankook Engineering Corp.*

Hankook Engineering Corp. (Engineering) was incorporated on March 10, 1971. Petitioner participated in the organization of Engineering, and he purchased 3,482 shares of stock in it for 3,482,000 won (approximately $11,000). He served as the president of Engineering and as an "auditor," a statutory officer of a Korean corporation. During 1972 through 1975, in return for serving as an auditor, petitioner received compensation as set forth in the table on page 270 *infra*.

## E. *Korean Corporations in General*

As was his practice concerning his United States businesses, petitioner did not participate in the day-to-day details of operating his various Korean corporations. Responsibility for the day-to-day operations of those corporations was delegated

to others, with petitioner's having final authority on all important corporate decisions. When in the office of his Korean corporations, he had a steady stream of visitors which included both business associates and friends. His major contribution to these corporations was in the development of new business, which was facilitated by his many contacts throughout the world.

During the years 1972 through 1975, petitioner received at least the following amounts of income from Korean corporations:

| Corporation | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Pan Ocean | $80,000 | $80,000 | $80,000 | $80,000 |
| Navigation | 0 | 0 | 13,836 | 23,037 |
| Tongsang | 10,000 | 10,000 | 11,320 | 2,262 |
| Moolsan | 25,000 | 25,000 | 25,000 | 2,975 |
| Engineering | 10,000 | 10,000 | 10,000 | 10,000 |
| Total | 125,000 | 125,000 | 140,156 | 118,274 |

### 5. Miscellaneous Business and Investment Activities

In the late 1960's, petitioner became an "international consultant" to Japan Line. In this connection, he frequently traveled to London, and he hired an employee to work out of Japan Line's London office during 1974 and 1975. In 1976, a corporation wholly owned by petitioner acquired a London townhouse for office and residential use.

In 1971, Bowsprit Co., Ltd. (Bowsprit), was formed under the laws of Liberia. The first meeting of its directors was held on April 26, 1973, in Hamilton, Bermuda. Petitioner has been Bowsprit's president, treasurer, and sole shareholder since at least May 1973. Petitioner's stock in Bowsprit was held for him by lawyers in Bermuda acting as nominees. Under an agreement dated November 1, 1975, Bowsprit agreed to render consulting services to a wholly owned subsidiary of Japan Line situated in Abu Dhabi, capital of the United Arab Emirates.

In April 1973, Five Star Navigation Co., Ltd. (Five Star), was incorporated under the laws of Liberia. Petitioner was elected to serve as its president and treasurer. All of Five Star's initial stock (100 shares) was issued to Bowsprit. Subsequently, in return for the help of Japan Line in arranging financing for an oil tanker to be purchased by Five Star, 49 shares of this stock

were transferred to Japan Line (Tanker), Ltd., a corporation related to Japan Line. In connection with the arrangements for financing the purchase of the oil tanker, petitioner met with officials of the Bank of Tokyo Trust Co. in New York.

During late September or early October 1973, petitioner traveled to Egypt where he met with President Anwar Sadat and the Egyptian Prime Minister. Because of encouragement given by these leaders, petitioner sought to establish a joint venture shipping company involving Five Star and the Egyptian State-owned shipping company. In 1974, Moolsan established a branch office in Egypt.

In 1974, Three Star Navigation, Ltd. (Three Star), was incorporated under the laws of Liberia. From the time of its incorporation through at least December 31, 1975, petitioner was the president, treasurer, and sole shareholder of Three Star.

On or about July 5, 1974, Bright Star Navigation, Ltd. (Bright Star), was incorporated under the laws of Liberia. From the time of its incorporation through at least December 31, 1975, petitioner was Bright Star's president, treasurer, and sole shareholder. The stationery of Bright Star, which directed that correspondence be sent to its U.S. office, was imprinted as follows:

BRIGHT STAR NAVIGATION LIMITED
c/o FIVE STAR NAVIGATION CO., LTD.
of Monrovia, Liberia

Tongsun Park        Please Reply to U.S.A. Office:
President           1776 K Street, N.W. (Suite 605)
                    Washington, D.C. 20006

Telephone (202) 785–3400 Cable Address: Fivestar Washington, D.C. RCA Telex: 248375

The address listed on the stationery was for the office of Milton Nottingham, Jr. (Nottingham), the vice president of Bright Star and a shipping consultant to petitioner and his various corporations. Bright Star also had an office located in London.

Bright Star was formed to act as the owner of two log carriers which had been acquired from Japan Line. Petitioner received staff support from J. S. Kim, an employee of one of

petitioner's companies, and from Nottingham, in connection with the acquisition of those vessels. Navigation, one of petitioner's Korean corporations, supplied the crews for the vessels.

On or about June 10, 1975, Fontas, Ltd. (Fontas), was incorporated under the laws of Bermuda. Petitioner was its president and sole shareholder at least through December 31, 1975. Fontas was established mainly to receive commissions earned by petitioner.

In 1975, petitioner and C. Wyatt Dickerson conducted negotiations with Japan Line on behalf of the Ashland Oil Co. They agreed that petitioner would receive 55 percent, and Dickerson would receive 45 percent of any commissions earned as a result of their work. During 1975, the Ashland Oil Co. paid $41,339.04 to a corporation owned by Dickerson, which in turn paid $22,736.50 to Fontas, at the direction of petitioner.

During 1975, petitioner and Dickerson were also involved in negotiating a settlement to a dispute between Burmah Oil Tankers, Ltd. (Burmah), and Japan Line. At the request of petitioner, Burmah agreed to pay $3 million to Fontas in consideration of the services rendered by petitioner and Dickerson in connection with the settlement. Fontas agreed to pay 40 percent of that amount to a corporation wholly owned by Dickerson. On June 20, 1975, Burmah paid a $2 million first installment to Fontas. Those funds were deposited in the Fontas account at a bank in Bermuda on June 26, 1975, together with five non-interest-bearing notes from Burmah to Fontas, each in the amount of $200,000 and payable on December 31, 1976. Pursuant to its agreement, Fontas paid $800,000 and transferred two of the notes to the corporation wholly owned by Dickerson. In addition to the amounts paid by Burmah, Japan Line agreed to pay $200,000 to Bowsprit in consideration of services rendered in mediating the settlement.

## 6. Bank Accounts

### A. Accounts in Petitioner's and Staff Members' Names

On February 15, 1961, petitioner opened a personal checking account at the Riggs National Bank, Washington, D.C. (Riggs Bank); he continued to maintain a checking account

with that bank through at least August 2, 1976. Prior to 1967, checks for petitioner's account at the Riggs Bank were imprinted with his name only. From February 1967 through January 1975, the checks were imprinted with his name and an address of 1713 22d Street, N.W., Washington, D.C.; thereafter, the address was changed to 1604 K Street, N.W., Washington, D.C. Petitioner carried and used the checkbook for this account when he went to Korea and when he traveled to other parts of the world. He sometimes left signed checks from the account with "staff members" (i.e., employees of petitioner or his corporations) in the United States who filled in the amounts, payees, and dates to take care of personal or other payments for petitioner as necessary.

From February 1975 through November 1977, petitioner also maintained with the Riggs Bank a series of "Household Accounts" in the names of various staff members. These accounts were used by the staff members to pay household and other personal expenses of petitioner. Petitioner did not write checks on these accounts.

Between 1964 and 1977, petitioner maintained a number of other personal checking accounts in the United States as follows:

| Bank | Years open |
|------|------------|
| Public National Bank Washington, D.C. | 1964–68 |
| Virginia National Bank Charlottesville, Va. | 1965–69 |
| Guaranty Bank & Trust Co. Fairfax, Va. | 1966–67 |
| Columbia National Bank Washington, D.C. | 1966–70 |
| Equitable Trust Bank Baltimore, Md. | 1970–75 |
| Industrial Bank of Japan New York, N.Y. | 1974 through at least 1976 |

| | |
|---|---|
| First National Bank of Maryland[1]<br>Towson, Md. | 1975–76 |
| Korea Exchange Bank of California<br>Los Angeles, Calif. | 1975–77 |

[1] The checking account with the First National Bank of Maryland was a joint account in the names of petitioner and R. L. Staples.

Several of these checking accounts were opened in connection with loans obtained by petitioner, the proceeds of which were disbursed to Suter's through the accounts; at least one such account was also used to pay personal expenses of petitioner. Deposits into the checking account with the Industrial Bank of Japan, which account petitioner used primarily when he was outside the United States, were made pursuant to instructions telephoned or cabled by petitioner. Both deposits into, and disbursements from, petitioner's account with the Equitable Trust Bank, which was used to pay expenses of petitioner and to transfer funds to and from other bank accounts, were made pursuant to instructions telephoned or cabled by petitioner. The account with the Korea Exchange Bank of California was used for only one transaction involving the transfer of $1 million to Korea for contribution to the Soong Eui Educational Foundation.

On February 3, July 21, and August 20, 1975, Richard Staples, on behalf of petitioner, purchased certificates of deposit from the Industrial Bank of Japan, New York, N.Y., in the amounts of $300,000, $1 million, and $650,000, respectively.[9] During 1975, interest accrued on those certificates of deposit in the total amount of $29,689.86 and was credited to the personal checking account maintained by petitioner at that bank.

On April 10, 1973, a checking account in petitioner's name was opened at the Bank of Bermuda, Hamilton, Bermuda. The account was closed on October 27, 1976. Of the moneys deposited in this account, sums in excess of $4 million were transferred to petitioner's accounts at the Equitable Trust Bank and the Industrial Bank of Japan.

---

[9] The Industrial Bank of Japan is a person carrying on the banking business as described in sec. 861(c)(1).

B. *Accounts in the Names of Corporations*

From 1966 through 1974 or 1975, petitioner was the sole authorized signatory on checking accounts maintained by Suter's. It was petitioner's practice to leave signed checks with Norman Larsen to be completed as necessary. Eventually, it became standard procedure for Larsen to sign petitioner's name to Suter's checks, and in 1974 or 1975, Larsen became an authorized signatory on Suter's accounts.

PDI maintained a checking account with the Bank of Virginia, Springfield, Va., with respect to which petitioner was the sole authorized signatory, from May 1968 through August 1975. During the period that PDI remained dormant, and to at least some extent thereafter, this checking account was used to pay personal expenses of petitioner; it was petitioner's practice to leave signed checks for this account with members of the PDI staff, who filled in the payees, dates, and amounts of the checks as necessary. Personal expenses of petitioner, such as utilities, improvements to his residential property, and medical bills, were also paid by staff members of PDI from one of the several other checking accounts maintained by PDI at different banks between 1973 and 1977, with respect to which those staff members, as well as petitioner, were authorized signatories.

On August 8, 1972, petitioner opened a checking account in the name of Daihan Nongsan Co., a Korean corporation in which he had no interest, at the American Security & Trust Co., Washington, D.C. Petitioner was the sole authorized signatory on this account; the address shown on the signature card for the account is 1825 24th Street, N.W., Washington, D.C. On April 10, 1973, petitioner had another checking account opened in the name of Daihan Nongsan Co., at the Bank of Bermuda. These accounts were closed on January 30, 1976, and August 23, 1974, respectively.

Other checking accounts were maintained in the names of corporations owned by petitioner as follows:

| Account in name of— | Bank | Period open | Authorized signatories |
|---|---|---|---|
| Five Star | Industrial Bank of Japan New York, N.Y. | Mar. 25, 1975– June 30, 1976 | Petitioner |
| Bright Star | Industrial Bank of Japan New York, N.Y. | Apr. 9, 1975– Jan. 19, 1977 | Petitioner |
| Bright Star | Industrial Bank of Japan New York, N.Y. | May 29, 1975– June 3, 1976 | Petitioner and Milton Nottingham |
| Bowsprit | Bank of Bermuda Hamilton, Bermuda | July 3, 1974– Aug. 3, 1976 | Petitioner |
| Three Star | Bank of Bermuda Hamilton, Bermuda | Oct. 16, 1974– July 16, 1975 | Petitioner |
| Fontas[1] | Bank of N. T. Butterfield & Sons, Ltd. Hamilton, Bermuda | June 26, 1975– Aug. 10, 1976 | Petitioner |

[1] This account was converted to an interest-bearing "call" account on June 30, 1975.

Most of the transactions under these accounts (i.e., deposits and transfers) were conducted pursuant to instructions telephoned or cabled by petitioner.

## C. *Bank Accounts in General*

Generally speaking, petitioner drew no distinctions between his personal bank accounts and his corporations' bank accounts. He treated money in the corporate accounts as if it were his own, and freely transferred such money to his personal accounts and between the various corporate accounts. He maintained bank accounts in Bermuda to receive commissions and other fees which he earned in order to avoid questions concerning the taxability of such amounts as U.S. source income. Bermuda does not levy an income tax, personal or corporate, on either residents or nonresidents.

## 7. *Rice Agency*

In 1968, petitioner was employed by the Rice Growers Association of California (RGA) to be its agent and represent it in connection with sales of rice to Korea. In order to serve effectively in such a position, the agent needed to have influence with, and be "accepted" by, the Korean Government as buyer. Petitioner used family and political ties to obtain the

position; RGA hired petitioner because it was made clear by the Korean Government that no sale could be made unless petitioner was the seller's agent. For the services he rendered as an agent of RGA, petitioner received commissions totaling approximately $200,000.

In 1970, petitioner was employed as an agent by Connell Rice & Sugar Co., Inc., of New Jersey (Connell Rice) to represent it in connection with sales of rice to Korea. During that year, Connell Rice paid petitioner $404,810.48 in commissions, by paying $202,310.48 directly into petitioner's checking account at the Equitable Trust Bank, and by paying $202,500 to RGA in reimbursement of advances made by RGA to petitioner.

Petitioner fell from favor with the Korean Government, and as a result, he was not employed as an agent by Connell Rice during 1971. Petitioner was interested in regaining his position with Connell Rice, and in this connection, he made an effort to improve his relationship with officials of the Korean Government. In order to do so, he enlisted the help of his family and friends in Korea. Petitioner also asked a number of U.S. Congressmen, with whom he was friends, to write letters to various officials in Korea on his behalf. In some cases, petitioner provided the Congressmen with drafts of what he wanted written. By March 1972, petitioner had successfully revitalized his relationship with officials of the Korean Government.

Connell Rice was not represented by an agent in Korea and made no sales of rice to Korea during the period from January through May 1972. Connell Rice was informed that, unless it was represented by a Korean agent, no purchase of rice would be made by the Korean Government. Accordingly, in June 1972, Connell Rice engaged what it believed to be Daihan Nongsan Co., a Korean corporation in which petitioner had no interest, to represent it in connection with sales of rice to Korea, and such representation continued through at least April 1974. During 1972, Connell Rice paid $585,865 in commissions into the account opened by petitioner in the name of Daihan Nongsan Co. at the American Security & Trust Co. During 1973, it paid $681,850.50 in commissions into that account and the account opened by petitioner in the name of Daihan Nongsan Co. at the Bank of Bermuda. In 1974,

Connell Rice paid $270,000 in commissions into the account opened by petitioner in the name of Daihan Nongsan Co. at the Bank of Bermuda. Unknown to Connell Rice, the services for which these commissions were paid were actually performed by petitioner and not by Daihan Nongsan Co.[10]

Connell Rice eventually learned that petitioner had performed all of the services for which commissions were paid to the accounts in the name of Daihan Nongsan Co., and in May 1974, petitioner was hired directly by Connell Rice to represent it in connection with sales of rice to Korea. Petitioner continued to represent Connell Rice through the end of 1975, negotiating sales of rice to the Government of Iran, as well as to the Korean Government. During 1974 and 1975, Connell Rice paid the following amounts (in addition to the $270,000 paid into the Daihan Nongsan Co. account) to petitioner and his various corporations:

### 1974

| Amount | Payee | Checking account to which payment made |
|---|---|---|
| $30,000.00 | Petitioner | Riggs Bank |
| 620,000.00 | Bowsprit | Bank of Bermuda |
| 2,785,000.00 | Three Star | Bank of Bermuda |

### 1975

| Amount | Payee | Checking account to which payment made |
|---|---|---|
| $2,855,125.64 | Three Star | Bank of Bermuda |
| 371,250.00 | Five Star | Bank of Bermuda |
| 244,750.00 | Bowsprit | Bank of Bermuda |
| 110,000.00 | PDI | National Bank |

These payments represented, at least in part, commissions for services rendered by petitioner in Korea and Iran. Connell Rice did not transact any business with Three Star, Five Star, Bowsprit, or PDI; it dealt solely with petitioner as an individual. Connell Rice made payments to those corporations, rather

---

[10]Connell Rice received instructions through its bank to make payments to the Daihan Nongsan Co. accounts opened by petitioner at the American Security & Trust Co. and at the Bank of Bermuda. Richard Staples was authorized by petitioner to transfer moneys from the Daihan Nongsan Co. account at the Bank of Bermuda to petitioner's personal checking account at the Equitable Trust Bank.

than making payments directly to petitioner, because petitioner requested it to do so.

## 8. Living Accommodations

### A. Living Accommodations in the United States

From February 10, 1961, through June 26, 1963, when in Washington, D.C., petitioner lived in a rented townhouse located at 3059 Q Street, N.W. On June 26, 1963, petitioner purchased a three-story brick house at 1713 22d Street, N.W., Washington, D.C. (the 22d Street house), for $60,000. To make this purchase, petitioner assumed a $15,000 mortgage on the property and secured a $45,000 mortgage loan on the property from the Washington Permanent Bank. The house was elegantly furnished, and contained a valuable collection of art objects which petitioner had brought to the United States from Korea. At least as early as 1968, petitioner employed a housekeeper, a full-time cook, and a chauffeur at the 22d Street house. On June 3, 1976, title to the 22d Street house was transferred to PDI, and the house was sold to a third party for $165,000.

From October 1, 1971, to October 24, 1972, petitioner leased, for a rental of $1,800 per month, a house located at 1825 24th Street, N.W., Washington, D.C. (the 24th Street house), in which he stayed when in Washington, D.C. Entertainment facilities in the 22d Street house were limited, and he leased the 24th Street house for the purpose of entertaining to advance his business and social interests.

On October 24, 1972, petitioner purchased a house located at 2211 30th Street, N.W., Washington, D.C. (the 30th Street house), for $270,000. He paid $85,000 down and obtained mortgage loans totaling $185,000. The house contained two stories and a basement and comprised a living room, dining room, study, powder room, kitchen, pantry, sitting room, dressing room, wine room, laundry room, and several bathrooms and bedrooms. The house was in need of certain improvements, and petitioner did not move into it until sometime in 1973.

Petitioner had a central air-conditioning system, a $20,000 central music system, and a security system installed in the 30th Street house. The house was elegantly decorated with

furnishings from the 22d Street house and with items newly acquired for the 30th Street house. Beginning in 1973, the household staff at the 30th Street house consisted, at any given time, of one housekeeper and one maid. During 1975, independent contractors were engaged to do gardening once or twice a month and to clean the chandelier. A chef was employed at the 30th Street house commencing August 1, 1975, through at least November 31, 1975. A chauffeur-houseman was employed at the house from May 1, 1975, through at least December 31, 1975.

In 1976, petitioner transferred the 30th street house to PDI, and he attempted to sell it through PDI to a third party. The sale was not consummated. Petitioner sold the house on June 19, 1978, for $520,000.

On July 15, 1974, petitioner purchased a condominium in the town of Ocean City, Md., for $41,000. The condominium was purchased primarily to help a friend of petitioner's who was trying to sell it quickly. During 1974, furniture and fixtures were purchased for the condominium at a cost of $4,108.79. On December 31, 1974, petitioner deeded the property to PDI, subject to a $31,000 mortgage. The condominium, which was used by employees of PDI and Suter's, was not visited by petitioner more than two or three times.

On December 11, 1974, petitioner purchased a cooperative apartment in the Watergate Apartments South, 700 New Hampshire Avenue, N.W., Washington, D.C., for $56,500. The Watergate apartment was occupied by an American friend to whom it was transferred in June 1976 at a considerable loss.

On December 5, 1975, petitioner purchased a large three-story house located at 2850 Woodland Drive, N.W., Washington, D.C., for $480,000. He continued to own this property through at least the end of 1977. Petitioner had planned to renovate this house and install an indoor pool, but he never occupied the house.

Petitioner employed Answering, Inc., of Washington, D.C., as a telephone answering service from 1963 through the years in question. During the period from 1963 through December 31, 1975, petitioner had a telephone listed in his name at each of the 22d and 24th Street houses, and he had two telephones listed in his name at the 30th Street house.

## B. *Living Accommodations in Korea*

From November 30, 1960, through December 1974, when in Korea, petitioner usually stayed with his mother at the Park family home located at 79–6, Kahae-Dong, Chongro-Ku, Seoul. Petitioner maintained a bedroom at the family home in which he kept clothing, personal effects, and a portion of his art collection. The family maintained a household staff consisting of a driver, a cook, a gardener, a doorman, a seamstress, and a cleaning lady.

From March 1969 through at least December 1972, petitioner leased a villa at a resort owned by the Government of Korea. Petitioner sometimes stayed at the villa when in Korea, but he used it primarily for entertainment purposes. Petitioner kept some personal property at the villa, including clothing and a few works of art. He employed a butler and a cleaning lady at the villa.

In late 1974, petitioner, his mother, and Navigation jointly acquired a 22-acre estate (the Hang-Dong estate) for approximately $817,000. This property, which petitioner and the co-owners continued to own at least through the time of trial, consists of a main house, a guesthouse, a swimming pool, a large cabana, a tennis court, a guard house, and an orchid greenhouse and related laboratory facilities. Following the acquisition of the Hang-Dong estate, petitioner maintained personal effects and a portion of his art collection at both the Hang-Dong estate and the Park family home. When petitioner was in Korea, he spent weekends with his mother at the family home, and she spent part of her time with him at the Hang-Dong estate. A household staff consisting of three gardeners, a cook, a cleaning lady, a butler, a driver, and two security guards was maintained at the Hang-Dong estate.

Korean citizens have two "registered" addresses: (1) A permanent or family address under the Family Registration Law, and (2) a residence address under the Residence Registration Law. The permanent or family address under the Family Registration Law is generally never changed; however, it must be canceled if the registrant acquires foreign citizenship. The residence address under the Residence Registration Law is required to be changed if the registrant intends to reside elsewhere for more than 30 days. If the registrant intends to reside overseas temporarily, he must report such fact. If a registrant departs Korea pursuant to a permanent residence

(immigration) type passport, his residence registration must be canceled. Petitioner's registered residence addresses under the Residence Registration Law included the following:

| Address | Dates |
|---|---|
| 52–2, Ankuk-Dong, Chongro-Ku, Seoul | Sept. 28, 1960– Nov. 30, 1960 |
| 79–6, Kahae-Dong, Chongro-Ku, Seoul | Nov. 30, 1960– Dec. 27, 1974 |
| 12–2, Hang-Dong, Yeoungdeungpo-Ku, Seoul | Dec. 28, 1974– present |

## C. *Miscellaneous Living Accommodations*

Beginning in 1975, petitioner maintained a permanent staff, including a houseman, a cook, a cleaning lady, a gardener, and a security guard, at a house that he owned in the Dominican Republic. Petitioner visited this house no more than twice during each of the years 1975 and 1976.

In 1976, when in London, petitioner stayed at a townhouse owned by one of his corporations and used in part for offices. Petitioner maintained personal effects and a portion of his art collection at the townhouse. He employed a staff of three at the London townhouse, including a butler, a housekeeper, and a chauffeur.

## 9. *Religious, Charitable, and Social Activities*

### A. *Religious Activities*

Petitioner was baptized at a Presbyterian Church in Seoul in October 1951 and has been a member of that church since June 1954. When he was in Korea, petitioner regularly attended Sunday services with his mother. Similarly, petitioner regularly attended Sunday services at several different Korean Presbyterian Churches when he was in the United States. Donations made by petitioner to the churches he attended in the United States were nominal as compared to the substantial and consistent contributions made by petitioner and his mother to the churches they attended in Korea.

## B. *Charitable Activities*

During the years 1964 through 1975, petitioner was associated with various nonprofit and charitable organizations located in the United States, primarily in the Washington, D.C., area. In October 1964, he helped form and became the chairman of the board of the International Youth Foundation for Freedom. He became a member of the Friends of the Corcoran Art Gallery in 1968 and subsequently made contributions to that organization. During 1974 and 1975, petitioner donated the use of his 30th Street house in connection with benefits held by two different charities. Petitioner also associated with, or made contributions to, several other charitable or civic organizations during the years in question.

Petitioner was also involved in numerous charitable and civic activities in Korea. He was a founding member of the Euro-American Alumni Association, which was formed in June 1960 to assist Korean students, who were educated abroad, to find employment in Korea. Petitioner has served on the executive committee of this association, and has annually donated to it approximately $2,000 since 1960. Petitioner was appointed as a counselor to the Korea University Labor and Research Institute on September 1, 1968. He served as an adviser to the institute between April 17, 1971, and August 28, 1972, and he made annual contributions to it throughout the years in question. In 1972, petitioner served as vice chairman of, and contributed some $13,000 to, the Korean Amateur Lawn Tennis Association. During the years 1972 through 1975, petitioner donated $20,000 per year to each of three Korean symphony orchestras, $5,000 per year to the (Korean) Traditional Dancing Association, and in excess of $1 million to the Soong Eui Educational Foundation. During those years, petitioner also made contributions to a foundation established in the memory of his father for the benefit of needy school children, and he was associated with, and made contributions to, several other Korean organizations.

## C. *Social Activities*

During the years 1968 through 1977, petitioner was listed in the "Social List of Washington, D.C.," popularly known as the Green Book, a compendium of socially prominent individuals in the Washington, D.C., area. Petitioner enjoyed an active social life while in Washington, D.C.; he entertained frequent-

ly and attended functions hosted by others for both social and business reasons. During the years 1972 through 1975, he hosted a number of parties for members of Congress and other socially prominent individuals in the Washington, D.C., area. Petitioner also entertained frequently when he was in Korea during those years, hosting functions attended by socially prominent Korean individuals and by high ranking political figures of both Korea and the United States.

During the early 1970's, petitioner worked to establish the George Town Club of Seoul. The club was founded not later than March 4, 1971, as a nonprofit membership organization, and a club facility was procured in October 1971.

## 10. Automobiles

Petitioner held a District of Columbia driver's license at various times during the years 1956 through 1973. He maintained a Korean driver's license during the years 1972 through 1975. He also maintained an international driving permit issued by the Korean Government on August 10, 1973. Petitioner acquired a Lincoln automobile in 1972, a Ford LTD station wagon in 1975, and a Jaguar in 1976, all of which were registered in the District of Columbia and which were issued license plate numbers TSP, TSP 2, and TSP 3, respectively. PDI purchased a Mercedes Benz and a Lincoln in 1975, and a Cadillac in 1976, all of which were registered in the District of Columbia and which were issued license plate numbers TP, TSP (transferred from the Lincoln purchased by petitioner in 1972), and 426–515, respectively. Petitioner was a member of the American Automobile Association from 1963 to February 15, 1977.

## 11. Miscellaneous

Residents of Korea are subject to strict foreign exchange controls. During the years 1972 through 1975, petitioner converted between 3 million and 4 million U.S. dollars into Korean won, and he repatriated those funds to Korea. Petitioner understood that he would not be permitted to reconvert those funds from Korean won to U.S. dollars.

Petitioner was not employed by the Korean Government or by any agency thereof during the period 1968 through 1975.

He has never run for an elected office in Korea and has never been appointed to any office by the Korean Government. During the years in question, he voted in the Korean presidential and parlimentary elections. He also voted on a referendum in Korea during those years.

The study of the U.S. Congress was petitioner's avocation. During the years 1970 through 1975, petitioner made numerous and substantial payments to U.S. Senators and Representatives and their families, or to their reelection campaigns.

During July 1976, the Public Integrity Section of the Criminal Division of the U.S. Department of Justice empanelled a grand jury to investigate the legality of certain payments allegedly made by petitioner to various Congressmen. Petitioner complied with numerous requests for documents in his possession and, in September 1976, he attended a conference at the Department of Justice at which he was informed of the purpose of the grand jury investigation.

An indictment against petitioner was handed down on August 26, 1977, charging him with various violations of titles 18 and 22 of the United States Code. On January 11, 1978, petitioner entered into an agreement of cooperation with the Department of Justice, as a result of which the indictment against him was dismissed.

Under Korean law, residents of Korea are taxable on their worldwide income, against which may be credited the payment of foreign income taxes. Nonresidents of Korea are taxable only upon Korean-source income. Wages and salaries payable by a Korean corporation are subject to withholding taxes. A resident of Korea who receives income from a non-Korean person or entity is required to file a Korean income tax return reporting such income.

Petitioner has not taken the position that he is a nonresident of Korea or that his income is not Korean-source income. Korean income taxes on the amounts that petitioner received from Korean corporations were withheld and paid by those corporations. With respect to the amounts previously set forth herein as interest from the Industrial Bank of Japan, commissions from Connell Rice, fees from Ashland Oil, fees from Burmah, and fees from Japan Line, petitioner did not pay income taxes to Korea or any other country. Petitioner did not file individual income tax returns with any country during the

years 1970 through 1976. Petitioner has never filed an individual income tax return in the United States.

ULTIMATE FINDING OF FACT

Petitioner was a resident of the United States for Federal income tax purposes during each of the years 1972, 1973, 1974, and 1975.

OPINION

The issue for decision is whether petitioner, an alien, was a resident of the United States for income tax purposes during the years in question. A resident alien is taxable on all income from whatever source derived; on the other hand, a nonresident alien is taxable only on income derived from sources within the United States. Secs. 871 and 872; secs. 1.1–1(b), 1.871–1(a), Income Tax Regs. Because petitioner had income that was not derived from U.S. sources, he is taxable on such income only if he was a resident of the United States during 1972 through 1975.

The issue of residency is factual and must be resolved through a consideration of all the relevant facts and circumstances. *Adams v. Commissioner*, 46 T.C. 352, 358 (1966); *Jellinek v. Commissioner*, 36 T.C. 826, 834 (1961). Because the determination of residency depends so heavily upon the unique personal circumstances of the taxpayer, one case does not always provide reliable guidance for the decision of another. For this reason, the cases relied upon by the parties are of limited value here.

As general guidelines for making the determination of residency, the regulations (sec. 1.871–2(b), Income Tax Regs.[11])

---

[11]Sec. 1.871–2. Determining residence of alien individuals.

(b) *Residence defined.* An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned.

provide that an alien actually present in the United States "who is not a mere transient or sojourner" is a resident of the United States for income tax purposes. Whether he is a transient is determined by his "intentions with regard to the length and nature of his stay." One who comes to the United States "for a definite purpose which in its nature may be promptly accomplished" is a transient; but if his purpose is of such a nature that "an extended stay may be necessary for its accomplishment" and to that end the alien "makes his home temporarily in the United States," he becomes a resident even though he may at all times intend to return to his domicile. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States "in the absence of exceptional circumstances." Sec. 1.871–2(b), Income Tax Regs. In applying these guidelines, an alien, by reason of his alienage, is presumed to be a nonresident, but that presumption is a rebuttable one.[12]

To these general guidelines, it may be added that the term "resident" does not have the same meaning as "domicile," but to be a resident "does require that the taxpayer have some degree of permanent attachment for the country of which he is an alien." *Jellinek v. Commissioner, supra* at 834. In other words, some permanence of living within borders is necessary to establish residence. *de la Begassiere v. Commissioner*, 31 T.C. 1031, 1036 (1959), affd. per curiam 272 F.2d 709 (5th Cir. 1959). One may be a resident of more than one country (*Marsh v. Commissioner*, 68 T.C. 68 (1977), affd. per order 588 F.2d 1350 (4th Cir. 1978)), and neither the termination nor the abandonment of a residence in another country is considered a

---

An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.

[12]Sec. 1.871–4. Proof of residence of aliens.

(a) *Rules of evidence.* The following rules of evidence shall govern in determining whether or not an alien within the United States has acquired residence therein for purposes of the income tax.

(b) *Nonresidence presumed.* An alien, by reason of his alienage, is presumed to be a nonresident alien.

(c) *Presumption rebutted.* * * * the presumption as to the alien's nonresidence may be overcome by proof—

*     *     *     *     *     *     *

(iii) Of acts and statements of the alien showing a definite intention to acquire residence in the United States or showing that his stay in the United States has been of such an extended nature as to constitute him a resident.

prerequisite to a finding of U.S. residence. *Adams v. Commissioner, supra* at 358, 362–363; *Marsh v. Commissioner, supra* at 72; *Dillin v. Commissioner,* 56 T.C. 228, 242 (1971).

Focusing on the definition of residence contained in the regulations, petitioner contends that he was a "mere transient or sojourner" and not a resident for tax purposes. He argues that the record establishes that he made a series of visits to the United States during the years in question and that each visit was for definite purposes which could be and were promptly accomplished. In further support of his position, petitioner asserts that he had extensive business and personal ties to Korea, and a deep, continuing involvement in his Korean community, which were irreconcilable with a "mere floating intention, indefinite as to time," to return to Korea. Further, petitioner emphasizes that each of his stays in the United States was limited by the immigration laws, and he contends that the record does not demonstrate the "exceptional circumstances" contemplated by the regulations as necessary to support a finding of residency in the face of such limitations. Finally, petitioner argues that respondent has failed to overcome the rebuttable presumption of alien nonresidence set forth in section 1.871–4, Income Tax Regs.[13]

Respondent takes the position that the record clearly shows that petitioner was a resident of the United States during the years 1972 through 1975.[14] He disputes petitioner's contention that the record establishes petitioner's presence in the United

---

[13]For the text of sec. 1.871–4, Income Tax Regs., see note 12 *supra.*

In *Adams v. Commissioner,* 46 T.C. 352, 361 n. 8 (1966), we concluded—

"that the presumption flowing from alienage has the effect of requiring the respondent to bear the burden of insuring that sufficient evidence is in the record to produce the status of a 'wash' vis-a-vis the presumption. * * * The burden of persuasion, of course, still remains with the petitioner."

[14]Part of respondent's argument on brief was that petitioner became a resident of the United States long before 1972 and did not abandon his residence in this country until he departed under the cloud of a Federal indictment in 1977. In this connection, see sec. 1.871–5, Income Tax Regs. Although the facts with respect to petitioner's pre–1972 connection with this country are relevant to our inquiry, we find it unnecessary to decide whether petitioner acquired residence in the United States at some time prior to 1972; the question for determination is whether he was a resident during the years 1972 through 1975. See *Constantinescu v. Commissioner,* 11 T.C. 37, 42 (1948).

In this connection, we note also that we have not made detailed findings as requested by petitioner with respect to many of his post–1975 activities. We think the relevance of such activities is minimal, as compared to his pre–1972 activities, given the initiation of the grand jury investigation in 1976.

States for "definite" purposes susceptible of "prompt" accomplishment. Respondent argues that, at best, the evidence relied upon by petitioner indicates dual or multiple residence but does not detract from his obvious relationship with the United States.

Petitioner's case was well tried and briefed, and handled with professionalism, but in the final analysis, we think the record requires that respondent's position be sustained. It is true that petitioner came to the United States on visas that technically limited his stays, and he was frequently absent from the United States. Because of the international character of some of his business activities, however, he did not stay continuously in any country. We think the duration and nature of his presence in this country, as evidenced by his deep and continuing involvement in business, personal, social, and political affairs, were sufficient to establish the kind of attachment and relationship to this country that constitutes residency within the meaning of the regulations under section 871. Therefore, in the light of all the facts, we hold that petitioner was a resident of the United States during 1972, 1973, 1974, and 1975.

In reaching this conclusion, we begin with the fact that, when petitioner was in the United States during 1972 through 1975, he was not a stranger in an alien land. He had spent a large part of the immediately preceding 20 years in this country. He had completed high school, attended the College of Puget Sound and Fordham University, and graduated from Georgetown University in June 1963 with a bachelor of science degree in Foreign Service. During this period, petitioner became a part of the Washington, D.C., community. From 1968 and extending through 1977, for example, he was listed in the "Social List of Washington, D.C.," popularly known as the Green Book, a compendium of socially prominent individuals in Washington, D.C. He had a host of friends whom he entertained frequently, and he often attended social functions given by others. His U.S. business interests were growing. Petitioner's extended stay in the United States during this pre–1972 period gave him an opportunity to obtain an excellent facility in the English language, an acquaintanceship with many American people, and an understanding of this country's social, political, and cultural fabric.

During 1972 through 1975, the years here in question, petitioner did not live as a "transient or sojourner"[15] intending to stay for only a temporary period. Throughout those years, petitioner spent a good deal more time in the United States than anywhere else in the world, and he spent increasingly less of his time in Korea.[16] During all 4 years he owned his own home in Washington, D.C., and home ownership reflects a degree of permanent attachment to, and integration into, the community.

As early as 1963, petitioner had bought a three-story brick house on 22d Street, and he continued to own it until June 1976. From October 1, 1971, to October 24, 1972, because the entertainment facilities in the 22d Street house had become inadequate for his purposes, he rented a larger house on 24th Street for $1,800 per month. On October 24, 1972, petitioner purchased the house on 30th Street which he owned through June 19, 1978. In this house, he made extensive renovations, including the installation of a $20,000 central music system. He furnished the house elegantly with items from the 22d Street house and with newly acquired furnishings. At least as early as 1968 and through the years in question, petitioner employed a staff of servants for these houses. On December 5, 1975, he bought still another house, a three-story residence on Woodland Drive which he owned through 1977. He had planned to install an indoor pool and make other renovations in this house, but he never actually occupied it.[17]

---

[15]Sec. 1.871–2(b), Income Tax Regs., quoted in note 11 *supra*. In *Swenson v. Thomas*, 164 F.2d 783, 784 (5th Cir. 1947), dealing with the residency of a U.S. citizen in a foreign country under the predecessor of sec. 911, the court said:

"[The regulation] excludes a 'mere transient or sojourner', and correctly. A transient means literally 'one going across', or passing through. 'Sojourner' is built around the French word 'jour', meaning a day, and signifies a mere temporary presence or visit."

Although that case arose under the predecessor of sec. 911, the same principles apply under sec. 871. *Scott v. United States*, 193 Ct. Cl. 27, 432 F.2d 1388, 1392 (1970).

[16]See note 21 *infra*.

[17]Petitioner seeks to discount the importance of his U.S. home ownership on the ground that he also owned a residence in the Dominican Republic which he staffed with servants, and a townhouse in London which served as a combination residence and office. We do not rest our conclusion on his U.S. home ownership, alone, although we think it is an important fact, but on the totality of the evidence before us. The record does not disclose sufficient information concerning his connection with the Dominican Republic or London even to suggest that his relationship with those locations was at all comparable to his life in the United States. Taking into account the time spent in the United States and Korea, it is obvious that he spent very little time in either the Dominican Republic or London.

Not only was petitioner's style of living inconsistent with that of a transient or sojourner, his investment and business activities reflect with equal clarity an ongoing attachment to, and relationship with, this country. *Jellinek v. Commissioner, supra* at 834. In fact, Washington, D.C., became the center of his business activity. The houses which served as petitioner's living quarters alone represented large investments of capital and credit, and some of the houses were sold for large gains. The house on 22d Street cost $60,000 and was sold for $165,000; the house on 30th Street was bought in 1972 for $270,000 and sold for $520,000. Petitioner paid $480,000 in 1975 for the house on Woodland Drive. In addition, in 1974 he bought a condominium in Ocean City, Md., for $41,000, and a cooperative apartment in the Watergate Apartments South for $56,500. Investments of such large sums obviously required thought and attention. A transient or sojourner present in the United States for a purpose which could be promptly accomplished would hardly be expected to make such large commitments, particularly for personal living quarters.

In addition to making large residential investments, petitioner also, as detailed in our findings, engaged in extensive business activities within the United States which were consistent only with an extended stay in this country. In 1965, through his controlled corporation, Suter's, he had purchased the valuable 1530 property on Wisconsin Avenue, N.W., giving a $325,000 first mortgage. Petitioner became one of the prime movers, along with various social and political leaders in Washington, in the promotion of the George Town Club, which he used as one of the centers of his extensive social life in Washington, D.C. Suter's leased the 1530 property to the George Town Club under a 25-year lease scheduled to expire August 31, 1990. As Suter's controlling shareholder, petitioner thus established what could only have been intended to be a substantial long-term business connection with this country. This connection was not merely a capital investment; Suter's was not only entitled to rent, but it also operated the restaurant and bar in the George Town Club. And, in 1971, Suter's and petitioner leased property adjoining the 1530 property and then subleased it to the club for expansion of its operations. Although petitioner did not concern himself with Suter's day-to-day operations, he made the major financial

decisions, including the acquisition of equipment, furniture, and real property throughout the years here in controversy.

Perhaps petitioner's most extensive business undertakings in this country, however, were carried out through his wholly owned PDI which, as noted in our findings, was "fundamentally an extension of its taxpayer-owner." *Valley Finance, Inc. v. United States*, 629 F.2d 162, 173 (D.C. Cir. 1980). Its business, in part, was to serve as a matchmaker and consultant to various American firms interested in trade in Korea and Formosa. In addition, it invested large sums in the United States. In 1974, PDI bought a house at 9124 River Road, Potomac, Md., for $225,649 from former Congressman Richard Hanna and resold it in October 1975 for $232,000. On January 2, 1975, PDI bought an office building at 1604 K Street, N.W., for $400,000, and petitioner personally guaranteed a $225,000 first mortgage to secure payment of a portion of the purchase price. On February 5, 1975, PDI loaned $500,000 to IOG, and pursuant to an option, the loan was later converted to stock ownership in that corporation. On July 31, 1975, PDI purchased 30 percent of the authorized stock of Wide World, a travel agency, and helped set it up for business in downtown Washington. PDI made other investments, and, in addition, its employees attended to numerous personal matters for petitioner.

Although petitioner was PDI's president and sole shareholder, he seeks to dismiss its extensive business activities on the ground that he only furnished capital while his agents and employees made all the decisions. Based on a review of PDI's operations, however, the Court of Appeals for the District of Columbia in *Valley Finance, Inc. v. United States*, 629 F.2d at 172, rejected that view:

Despite protestations in the record, there is no evidence that a major corporate decision was ever made by anyone other than Park [petitioner in the instant case]. The Board of Directors played no meaningful role. There is serious doubt as to whether a Board existed at all prior to December, 1974. After that date, directors met infrequently. When they did meet, Board members approved corporate decisions and policies without discussion or question. * * * Individual officers performed ministerial functions at the behest of the president. They exercised no significant discretionary authority. * * *

Similarly, the record here refutes petitioner's disavowal of any real involvement in PDI's business. It is clear that PDI's

activities could have been conducted only by one with a continuing relationship with this country—in this country on an extended stay for purposes which could not be promptly accomplished.

Petitioner's most lucrative business activity was his representation of Connell Rice, a New Jersey corporation that sold rice to Korea and other countries. As explained in our findings, he received over $400,000 from that company in 1970. He then lost favor with the Korean Government and was not employed by Connell Rice in 1971. However, petitioner revitalized his relationship in 1972, and during the years in question, petitioner, or his designees, received sums from Connell Rice totaling approximately $8.5 million. One big factor enabling petitioner to reestablish his relationship with the Korean Government in 1972, according to his testimony, was the intervention, at his request, of powerful U.S. politicians. Maintaining good relationships with those U.S. political figures was thus important to this ongoing business activity in case he should need again to use this country's political processes and power. Certainly, the cultivation of such political relationships in this country could not be accomplished by a transient or sojourner.

Our findings detail some of petitioner's other extensive business dealings, including his investment in the Pisces Club and the M Street Corporation, involving hundreds of thousands of dollars in loans and loan guarantees.[18] Such deep involvement in business, as well as social and political, activities is wholly inconsistent with the status of a mere transient or sojourner.

Petitioner's main argument is based on that portion of the regulation, quoted in note 11 above, which provides that an alien individual who comes to the United States for a definite purpose, which in its nature may be promptly accomplished, is a transient and not a resident of the United States. Petitioner states on brief that he made 36 "trips" to the United States during 1972 through 1975 and stayed an average of 22 days on

---

[18]We do not intend to suggest that mere investment in a country by an alien constitutes residency. However, as we have discussed, it is important that the nature and breadth of petitioner's business and investment activities in the United States were such as to require continuous attention.

each "trip," the longest stay being 50 days and the shortest 4 days. Based on his testimony as to the purpose for each trip, petitioner asks us to find that the purpose of each trip could be accomplished promptly and that, therefore, under the regulation, he was not a U.S. resident. Respondent counters with the argument that in the years 1972 through 1975 petitioner made a series of "trips" to Korea for purposes which could be promptly accomplished, most of which were for 5 days or less, and spent considerably more time in the United States than in Korea.

We have not made the findings requested by petitioner because we think petitioner had long-term ties to this country which explain his extended presence. We are not convinced that the purposes he gave for his presence in the United States were the exclusive or dominant ones. For example, in none of petitioner's testimony on his purposes nor in the related requested findings is there any reference to the myriad business problems and decisions he dealt with in this country: The continuously serious management problems related to Suter's and the George Town Club (leading ultimately to the forgiveness of the club's indebtedness to Suter's in the amount of $340,000 in 1978); the October 24, 1972, purchase of the house on 30th Street for $270,000; the September 26, 1974, purchase of the 9124 River Road house for $225,649; the December 11, 1974, purchase of the Watergate apartment for $56,500; the January 2, 1975, purchase of the 1604 K Street office building for $400,000; the May 1, 1975, memorandum of understanding whereby he agreed to buy 80 percent of the M Street corporation stock for $40,000 and to loan that corporation $250,000; the July 17, 1975, decision to authorize a $350,000 loan to the M Street corporation; the July 25, 1975, investment of $100,000 to $150,000 in Valley Finance; the July 31, 1975, purchase of Wide World stock for $37,500, and, on the same date, a loan to that company in the same amount; the 1975 purchase of Diplomat National Bank stock for $250,000; the December 5, 1975, purchase of the Woodland Drive house for $480,000; his efforts to promote his political connections related to Connell Rice; or any of the management activities inevitably required by such large investments.

Businessmen do not enter into transactions of such magnitude without advance planning, forethought, analyses, ap-

praisals, and comparisons. It will not do to say that one as highly intelligent, money oriented, and status conscious as petitioner left all of his business decisions to his employees and advisers. As pointed out above, the Court of Appeals for the District of Columbia in *Valley Finance, Inc. v. United States, supra*, rejected that argument with respect to PDI, and we reject it here. Petitioner may have left the ministerial details to his employees, but he made the important decisions. We think these business activities and the subsequent continuous management problems related to his investments, as well as the promotion and protection of his Connell Rice—Korean Government connection, tied him to the United States. We do not think that the statute was intended to relieve aliens who engage in business and other activities as extensively as did petitioner. The length and nature of his presence in this country made him a resident.[19]

Petitioner, however, emphasizes that, during 1972 through 1975, he was present in the United States on E–2 (treaty investor) or B–1 (temporary visitor for business) visas which, under the immigration laws, limited his stay to "a definite period." In this connection, he argues that under the last sentence of section 1.871–2(b), Income Tax Regs., quoted in note 11 *supra*, he was not, therefore, a resident of the United States. That sentence states, in part, that an alien whose stay

---

[19]In *Commissioner v. Nubar*, 185 F.2d 584 (4th Cir. 1950), revg. 13 T.C. 566 (1949), the taxpayer came to the United States on Aug. 1, 1939, on a 3-month visitor's visa which, on application, was extended to Dec. 31, 1940. In Jan. 1941, he was arrested and ordered deported; appeals of that order culminated in an order that he leave the United States within 90 days after termination of hostilities in Europe. Prior to his departure, he traded extensively in stocks and bonds during 1941 through 1945. Holding that, despite the deportation order, he was a resident alien, the court said (185 F.2d at 586):

"We find nothing in the law or in the facts to justify the exemption of this alien, who had lived in our country during the war years because of the difficulties and dangers of departure, and who had availed himself of his presence here to make a fortune by trading on our exchanges, from taxes required of others by the country whose protection he had enjoyed and whose economic organization he had utilized for his profit. * * *

"Whether taxpayer was a non-resident within the meaning of the statute is to be determined not in vacuo, but with reference to the purpose for which the statute was passed, which was to exempt from taxation, except as to taxes which could be collected at the source, aliens over whom no effective jurisdiction in enforcement of the tax laws could be exercised. It was never intended that persons who were present within the country for long periods of time and had taken advantage of its facilities for the purpose of carrying on business, should be exempted from taxation on income derived from sources within the country merely because they were aliens. * * * "

in the United States is limited to a definite period by the immigration laws is not a resident of the United States. Significantly, however, that provision applies only in the "absence of exceptional circumstances," and we think the facts here show exceptional circumstances.

It is true that petitioner's stay in the United States was nominally restricted to limited time periods. As set forth in our findings, however, beginning at least as early as September 4, 1968, petitioner's visas were all relatively long-term multiple entry visas. For the 4 years in controversy, he had only three visas, issued October 27, 1971, August 10, 1972, and July 10, 1973, respectively. This last visa was valid for 4 years or until July 9, 1977. Under these visas, by careful observance of the immigration regulations, petitioner could go, come, or stay as he pleased, substantially without restrictions,[20] and he spent considerably more time in the United States during each of the years in question than in any other country in the world.[21]

Due to the international nature of some of petitioner's business activities and the resulting requirement that he travel often, petitioner was absent from the United States on numerous occasions; but these absences did not affect his assimilation into the Washington, D.C., community. We have pointed out that he was listed in the Green Book, the compendium of socially prominent individuals in that city. He had numerous accounts in local banks through which literally millions of dollars passed during the years in issue. He borrowed money in his own name and for his corporations and personally guaranteed loans. He owned automobiles bearing personalized license plates. He attended local churches on a regular basis and was involved with local charitable and civic endeavors. In addition, he entertained frequently and lavishly, thereby becoming closely associated with numerous Senators,

---

[20]See *Brittingham v. Commissioner*, 66 T.C. 373, 414–415 (1976); *Schumacher v. Commissioner*, 32 B.T.A. 1242, 1247–1248 (1935). Cf. *Schoneberger v. Commissioner*, 74 T.C. 1016, 1027 (1980).

[21]The following table compares the number of days petitioner spent in the United States with the days spent in Korea:

|  | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Days in United States | 180 | 199 | 198 | 161 |
| Days in Korea | 159 | 109 | 95 | 79 |

Congressmen, Cabinet officers, ambassadors, military personages, and other civic, business, and society leaders in Washington, D.C. This assimilation into the Washington, D.C., community is evidence that petitioner was not a transient or sojourner but that he intended to (and did) stay in the United States for an indefinite period notwithstanding his technically limited visa status.

There is no suggestion in the record that the immigration authorities at any time, other than once shortly before petitioner's high school graduation, raised any questions on the number of his entries or the length of his stays. Coupling the discretion which the long-term multiple entry visas gave petitioner and the total amount of time he spent in this country each year with his extensive investments, numerous business ventures, elaborate living quarters, and integration into the Washington, D.C., community through continuous social activities within the society, business, and political circles of Washington, D.C., we think "exceptional circumstances" within the meaning of the last sentence of section 1.871–2(b), Income Tax Regs., have been shown.

It is no doubt true that petitioner was domiciled in Korea during the years in issue, and his relationship with that country may have been sufficiently close to constitute residency. After all, he was born there and his mother lived there. His family was wealthy, and he had significant business and social ties to Korea, more fully described in our findings. But we do not agree with petitioner that his ties to Korea, vis-a-vis those to the United States during 1972 through 1975, were so strong as to negate a finding that he was a U.S. resident.

Except for Korean income taxes withheld from amounts that petitioner received from Korean corporations, petitioner did not pay income taxes to either the United States or Korea on any portion of the substantial income which he received during the years in question. Significantly, petitioner testified that his major contribution to his Korean corporations was in the development of new business, and this appears to have been done mainly in the United States. Further, as previously indicated (pp. 287–288 *supra* ), the fact that petitioner had ties to and may never have abandoned a residence in Korea does not preclude the conclusion that petitioner was a resident of the United States during the years in question. In our opinion,

his United States homes, investments, business activities, and political, social, and other ties were so deep and extensive as to show that his stay in this country throughout 1972, 1973, 1974, and 1975, was "of such an extended nature as to constitute him a resident." Sec. 1.871–4(c)(2)(iii), Income Tax Regs.

*An appropriate order will be entered.*