T.C. Memo. 2005-37

UNITED STATES TAX COURT

FARAMARZ AND MITRA ELGHANIAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

FARAMARZ ELGHANIAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 254-03, 256-03.[1]     Filed February 28, 2005.

<u>Howard S. Fisher</u>, for petitioners.

<u>Jack H. Klinghoffer</u> and <u>Gerard Mackey</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax and an addition to tax and a
penalty as follows:

---

[1]  These cases were consolidated for trial, briefing, and
opinion.

Faramarz Elghanian

| Year | Deficiency | Addition to Tax and Penalty Sec. 6661, I.R.C. | Sec. 6662(a), I.R.C. |
|------|-----------|-----------|-----------|
| 1987 | $1,867 | | |
| 1988 | 186,159 | $46,540 | |
| 1989 | 219,622 | | $43,924 |

Faramarz and Mitra Elghanian

| Year | Deficiency |
|------|-----------|
| 1990 | 3,949 |
| 1991 | 3,949 |

The issues for decision are:

1.   Whether petitioner's[2] loss on the expropriation of his family's Iranian property occurred in 1979, as respondent contends, or in 1986, as petitioners contend.  We hold that it occurred in 1979.

2.   Whether petitioner was a resident of the United States in 1979.  We hold that he was not.

3.   Whether petitioner is entitled to a settlement of his claimed deduction for expropriation losses on the same terms as respondent's settlement with petitioner's father and brother.  We hold that he is not.

4.   Whether petitioner is liable for the addition to tax under section 6661(a)[3] for 1988 and the accuracy-related penalty

---

[2]   References to petitioner are to Faramarz Elghanian.

[3]   Section references are to the Internal Revenue Code as amended and in effect in the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

under section 6662(a) for 1989 for substantial understatement of tax. We hold that he is not.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners

Petitioners were married and resided in France when they filed their petition.[4]

1. Petitioner's Family and Early Years

Petitioner was born in Iran in 1950 or 1951. Petitioner's father and several of his father's brothers owned businesses in Iran which had 5,000-8,000 employees in the 1970s.

Petitioner's father was born in Iran. His mother was born in London. Petitioner attended school in Iran from 1957 to May 1965. Petitioner never worked for his family's businesses in Iran.

Petitioner applied for an alien registration receipt card (green card)[5] in 1965 when he was about 14 years old. In his

---

[4] Petitioner testified that he and his wife resided in France beginning before Sept. 11, 2001, and continuing through the date of trial. Petitioners stated in the petition that their mailing address was c/o Steven E. Golden, C.P.A., in New York, New York. There is no evidence that they resided in New York when they filed the petition.

[5] "Green card" is the common name for a Form I-151, Alien Registration Receipt Card. See Moorhead v. United States, 774 F.2d 936, 938-939 n.4 (9th Cir. 1985); Gooch v. Clark, 433 F.2d 74, 76 (9th Cir. 1970); see also sec. 264 of the Immigration and Nationality Act (1952), ch. 477, 66 Stat 163, 224, as amended, 8 U.S.C. sec. 1304 (1994); 8 C.F.R. sec. 264.5 (2000); Gordon &

green card application, petitioner said that he intended to study in the United States and stay as an immigrant. The United States issued a green card[6] to petitioner, his parents, and a brother and sister in the mid-1960s. Petitioner's father came to the United States in the mid-1960s for an amount of time not specified in the record and then returned to Iran.

Petitioner visited the United States in July 1965. He had his green card at that time. Also that month, he began attending high school in Great Britain. Petitioner attended high school in England until May 1969.

2. Petitioner's Presence in the United States From 1969 to 1977

Petitioner applied only to colleges in the United States. Petitioner came to the United States on an Iranian passport and a student visa[7] issued by the United States in 1969.

Petitioner attended Florida Southern College from July 1969 to May 1973, and he received a 4-year college degree in business.

---

Rosenfield, Immigration Law and Procedure, sec. 6.10d (rev. ed. 1959) and sec. 6.9d (rev. ed. 1985).

[6] In a letter to petitioner dated Sept. 22, 1986, the District Director for the New York District of the U.S. Department of Justice, Immigration and Naturalization Service, stated that petitioner was a lawful permanent resident on July 28, 1965.

[7] A student visa authorizes an alien to be admitted to the United States for the time necessary to complete a full course of study plus 60 days. Immigration and Nationality Act (1952), ch. 477, sec. 101(a)(15)(F), 66 Stat. 163, 168; 8 U.S.C. sec. 1101(a)(15)(F); 8 C.F.R. sec. 214.2(f)(5).

While in Florida, petitioner obtained a license to buy and sell real estate.

Petitioner went to Iran about once every 2 years during the years he was an undergraduate student. He stayed 2-3 weeks per visit. In the late 1960s and early 1970s, petitioner told his parents that he intended to reside in the United States. Petitioner married his cousin, Shirley Elghanian, in Iran in July 1972.

Petitioner began attending graduate school at George Washington University, Washington, D.C., in September 1973. He received a master's degree in business administration in 1976. Petitioner and Shirley Elghanian rented an apartment in Washington, D.C., while petitioner attended George Washington University.

After petitioner finished graduate school, he and Shirley Elghanian shared an apartment in Boston with Moeez Elghanian, Shirley Elghanian's brother and petitioner's cousin. Petitioner and Moeez Elghanian viewed various properties for possible syndication, and they traveled frequently.

Petitioner told his brother Phillip Elghanian after 1970 and after petitioner got married that he intended to reside in the United States. Nassar Victory (Victory), petitioner's second cousin, saw petitioner about 10 times per year from 1970 to 1977. Petitioner told Victory that he intended to reside in the United

States. After graduate school, petitioner told Steven Kumin (Kumin), a friend of his who lived in the Boston area, that petitioner intended to reside in the United States.

3. <u>The Customs Administration Building in Tehran, Iran</u>

On a date not specified in the record, petitioner's father paid about $2 million to buy land in Tehran, Iran, on which he intended to build his personal residence. At a time not specified in the record, petitioner's father arranged to have the Customs Administration Building constructed on that site. Petitioner's parents owned the land on which it was to be built.

The Customs Administration Building had 3 underground parking levels, about 25 retail stores, and 3 office towers which were 11 or 12 stories high. The building occupied about an acre of land. It cost about $15 million to build the Customs Administration Building and another $1.5 to $2 million for tenant improvements. The Iranian Department of Taxation and Customs occupied the Customs Administration Building.

Petitioner conveyed an interest in the building (about 6 meters by 14 meters, not otherwise described in the record) to the regional electrical company for a price not stated in the record on a date not clear from the record.

4. Events From 1977 to June 1979

Based on the experiences of some of his relatives, petitioner believed that he would be required to serve for 2 years in the Iranian military in order to return to Iran later to deal with his family's property. On a date in 1977 not specified in the record, petitioner returned to Iran to begin that service. Petitioner's parents lived in Iran at that time. Petitioner left a car, some dishes, photographs, and clothing in Boston, which he intended to reclaim later.

Shirley Elghanian returned to Iran with petitioner in 1977. Petitioner's daughter, Roya, was born in Iran in December 1977. Because of political unrest in Iran, Shirley Elghanian and Roya went to London in 1978 to live with Shirley Elghanian's parents.

Petitioner's mother and his brother, Phillip Elghanian, moved to the United States in 1978.

B. Events in 1979

1. The Expropriation

In January 1979, the Shah of Iran was deposed in a revolution. The Ayatollah Khomeini became the new leader of Iran.[8]

---

[8] For a more detailed account of these events in Iran, see Contl. Ill. Corp. v. Commissioner, 94 T.C. 165 (1990); Halliburton Co. v. Commissioner, 93 T.C. 758 (1989), affd. 946 F.2d 395 (5th Cir. 1991); and Moshrefzadeh-Sani v. Commissioner, T.C. Memo. 1992-592.

Petitioner's father moved to the United States in 1979. Petitioner's father's green card was renewed at that time. Petitioner's parents have lived in the United States since 1979. In April or May 1979, petitioner's father asked his son-in-law, Alex Ebrahimzadeh (Ebrahimzadeh), to retrieve the family's green cards from petitioner's father's office in Tehran and bring them to him in New York. A U.S. Customs inspector confiscated those green cards when Ebrahimzadeh brought them into the United States.

2.    Petitioner's Imprisonment and Escape From Iran

Petitioner completed 2 years of service in the Iranian military around May 1, 1979. He intended to leave Iran at that time, but the Iranian government prevented petitioner from leaving. Habib Elghanian, petitioner's uncle, was executed on May 29, 1979. The Iranian government expropriated petitioner's family businesses and property.

On June 1, 1979, petitioner was arrested, blindfolded, interrogated, and imprisoned. He was released on July 1, 1979, He reasonably feared for his life in Iran, and on July 13, 1979, he fled from Iran under an assumed name. He has not returned to Iran since then.

3.    Petitioner's Travels in 1979

After leaving Iran, petitioner went to London to see Shirley Elghanian and Roya. He stayed there for a few weeks. On August

1, 1979, he traveled to Spain to visit his brother, Farhad
Elghanian, and to obtain a visa to come to the United States. He
received a B-1 or B-2 entry visa.[9]

Petitioner then went to New York where he spent about 3
weeks with his parents, family, and friends. He then went to
France for about 1 month. Petitioner went to London for 2-3
weeks in November 1979, and then to Israel for 1-2 weeks, and
back to London for about 2 weeks.

Petitioner then went to New York, stayed briefly with his
parents, and, in December 1979, began occupying an apartment at
279 E. 44th Street owned by petitioner, his wife, and her two
sisters. Petitioner had a birthday party for his brother Phillip
at that apartment in December 1979.

---

[9] B visas permit aliens to enter the United States
temporarily if they have a foreign residence that they have no
intention of abandoning, and do not engage in labor, study, or
work as a representative of foreign media while in the United
States. See sec. 101(a)(15)(B) of the Immigration and
Nationality Act, 66 Stat. 168, 8 U.S.C. sec. 1101(a)(15)(B). A
B-1 visa may be issued to an alien visiting the United States on
business for up to 6 months and may be extended for periods of up
to 6 months. 8 C.F.R. sec. 214.2(b) (1976); see Elsaesser v.
Commissioner, T.C. Memo. 1978-2 (applies 8 C.F.R. sec. 214.2(b)
(1976)). B-2 visas are issued to aliens who are temporary
visitors to the United States for business or for pleasure. See
sec. 101(a)(15)(B) of the Immigration and Nationality Act, 66
Stat. 168, 8 U.S.C. sec. 1101(a)(15)(B); 22 C.F.R. 41.12 (1970
ed.). A B-2 visa may be issued to an alien visiting the United
States temporarily if the alien has permission to enter a foreign
country when he or she leaves the United States. 22 C.F.R. sec.
41.25 (1970 ed.); see Dillin v. Commissioner, 56 T.C. 228, 243
(1971) (discussing B visas and applying 22 C.F.R. sec. 41.25
(1970 ed.)).

Petitioner was not engaged in the sale of stock as a trade or business in 1979.  Petitioner owned a rental apartment near London that he had received as a gift.  He never lived in that apartment.

C.  Events in the 1980s

1.  Filing of Petitioner's Family's Expropriation Claim

Petitioner and his family learned of the expropriation in 1980.  On May 15, 1980, petitioner's father, on behalf of his immediate family, filed with the Office of Foreign Assets Control of the United States Department of the Treasury a claim for the expropriated property (Census of Claims by United States Persons Against Iran).  In it, petitioner's father claimed expropriation losses of $113,530,000, including stock which he valued at $11,580,000; the Customs Administration Building which he valued at $20 million; other real property which he valued at $10.45 million; loans which he valued at $1.5 million; and tangible personal property which he valued at $70 million.  Petitioner signed the claim.  In the claim, petitioner's father stated that the date of loss was June or July 1979.  Petitioner's family prepared the form from memory.  None of the property listed in the claim was ever connected with a trade or business in the United States.

2.  Petitioner's Activities

In 1980, petitioner traveled to and from New York and Europe, spending a month or two at each location.  At that time, petitioner's wife's family owned four or five hotels in central London, the largest of which had 400 rooms.

Shirley Elghanian and Roya were in London until the end of 1981.  At that time they went to New York and stayed with petitioner in the apartment at 279 E. 44th Street.  In May 1982, petitioner, Shirley Elghanian, and Roya moved to an apartment on 57th Street in New York, where they lived until September 1982.

Petitioner and Shirley Elghanian separated in September 1982.  Shirley Elghanian and Roya went to London on October 6, 1982.  Petitioner went to London in late October 1982, to visit Roya, to try to reconcile with Shirley Elghanian, and to retain divorce counsel.  Thereafter, petitioner traveled frequently between London and New York to try to gain custody of Roya and to conduct business not described in the record in London.

On September 7, 1983, U.S. Immigration and Naturalization Service (INS) authorities stopped petitioner at JFK International Airport.  They alleged that he had presented an altered Iranian passport.  Petitioner told them that personnel at an Iranian consulate had made handwritten entries on the renewal pages of petitioner's Iranian passport, including extending the expiration date.  At that time, in response to a request from an INS

officer, petitioner provided an affidavit regarding his application to enter the United States.  In it, he said, inter alia, (1) that he did not have an apartment in the United States, (2) that he would eventually like to reside permanently in the United States, and (3) that he intended to stay in the United States for several weeks and then travel to Israel.

Petitioner applied for political asylum in the United States in October 1983.  He was staying at his parent's apartment in New York at that time.  Petitioner was granted political asylum in the United States on April 20, 1984.  He was divorced from Shirley Elghanian in 1984.

Around 1985, petitioner's family heard that the Iranian government would welcome expatriates to return to run their former businesses.  Khalil and Soleyman Elghanian, petitioner's cousins, went to Iran on behalf of the family in 1985 in an attempt to reclaim Elghanian family assets.  They discovered that the offer was a hoax.  They believed that they were in danger in Iran.  They paid smugglers to help them escape from Iran.

D.    Petitioner's Tax Filing and Earnings History and 1986 Income Tax Return

Petitioner filed no U.S. Federal income tax returns for any tax year before 1986.  He had no earnings in the United States before 1987.

A certified public accountant (C.P.A.) prepared petitioner's 1986 income tax return on April 21, 1987. In it, petitioner reported no gross income and no tax due.

On November 5, 1987, petitioner's C.P.A. prepared petitioner's amended return for 1986. In that return, petitioner claimed a $9,339,066 loss on Form 4797, Gains and Losses From Sales or Exchanges of Assets Used in a Trade or Business and Involuntary Conversions. The $9,339,066 loss was based on petitioner's share of the family assets expropriated by the Iranian government. Petitioner attached the following statement to his amended 1986 return:

> The losses taken on Form 4797 represent taxpayers'
> losses of business assets in Iran. They are based
> solely on the Census of Claims by United States Persons
> Against Iran filed with the Office of Foreign Assets
> Control, Department of the Treasury, Washington, D.C.
> 20220, by the taxpayers' family. The taxpayers' family
> has allocated to each family member their proportionate
> interest in such assets. The only losses taken were
> those the taxpayer deemed to be business assets and it
> is their contention that amount claimed are their
> costs. The taxpayers determined that these assets were
> only seized in 1986. The tax preparers have not
> verified the assets, their costs or the year the loss
> was incurred.

E.    Petitioner's 1987-91 Income Tax Returns

Petitioner filed returns for 1987-89, and petitioners filed joint returns for 1990-91 in which they reported the following:

| Year | Wages | Taxable Interest | Dividends | State Tax Refund | Capital (Losses) | Sched. E (Losses) | Net Operating (Losses) |
|---|---|---|---|---|---|---|---|
| 1987 | | $5,272 | $2,957 | | ($3,000) | | ($9,339,066) |
| 1988 | $400,000 | 262,895 | 395,255 | | (3,000) | ($17,708) | (694,227) |
| 1989 | 1,000,000 | 701,424 | 218,188 | | (3,000) | (231,737) | (8,622,478) |
| 1990 | | 719,826 | 31,905 | | (3,000) | (79,383) | (25,850) |
| 1991 | 6,921 | 133,587 | 16,136 | $958 | (3,000) | (447) | |

## F.    Events After the 1980s

Petitioner married Mitra Rasson in New York, New York, in 1990.  Petitioner began living with his family in France at a time not specified in the record before September 11, 2001, and continuing through the date of trial.  His children attend school there.  Petitioner has never become a citizen of the United States.

## G.    Respondent's Settlement With Petitioner's Father and Brother

Petitioner's father and Phillip Elghanian each deducted losses of $9,339,066 for 1980 from the expropriation of their Iranian property.  Those losses were carried forward to 1988 and 1989 by petitioner's father and to 1989 by Phillip Elghanian.  In 2003, the Commissioner allowed each of them an NOL of $3,868,946.

OPINION

## A.    Whether the Expropriation Loss Occurred in 1979 or 1986

To be a deductible loss under section 165, the transaction must be closed, completed, and fixed by identifiable events in the taxable year.  Boehm v. Commissioner, 326 U.S. 287, 291-292 (1945); sec. 1.165-1(b), Income Tax Regs.  Whether a loss occurred during a particular taxable year is a question of fact. Boehm v. Commissioner, supra at 294; Korn v. Commissioner, 524

F.2d 888, 890 (9th Cir. 1975), affg. T.C. Memo. 1973-258.  An important indication of the year of loss is the year that the taxpayer loses control and possession of the property.  United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 402 (1927).

Petitioners contend that the expropriation loss occurred in 1986 because (1) the Iranian government promised until 1986 to restore the assets to the Elghanian family if they would return to operate the business; (2) petitioner believed until the time of the Iran-Contra affair in 1986 that the United States would overthrow the Iranian government, enabling his family to recover its property; and (3) petitioner had a reasonable prospect of recovery until 1986.

We disagree.  The Iranian government's attempt to lure members of petitioners' family back to Iran was a hoax. Petitioner's belief that the United States would restore his family's property was remote, nebulous, and speculative.  A loss deduction is not postponed based on remote or nebulous possibilities of recovery.  Id. at 402-403.  We conclude that the loss did not occur in 1986, and, based on this record, that it occurred in 1979, the year of the expropriation.[10]

---

[10]  Petitioners bear the burden of proof on the residence and expropriation loss issues.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The burden of proof for a factual issue may shift to the Commissioner under certain circumstances.
(continued...)

B.    Whether Petitioner Was a Resident of the United States in 1979

    1.    Background

The parties dispute whether petitioner was a resident of the United States in 1979.[11]  If petitioner was not a U.S. resident in 1979, then petitioners may not deduct the expropriation losses in 1979, or carry those losses forward to later years during which he was a U.S. resident.

An alien is a resident of the United States if he or she is present in the United States and is not a mere transient or sojourner, the determination of which depends on the intended length and nature of the stay.  Sec. 1.871-2(b), Income Tax Regs. The fundamental issue in determining residence is whether the alien intends to make the United States his or her home.  Dawson v. Commissioner, 59 T.C. 264, 268 (1972).  An alien who lives in the United States and has no definite intention as to his or her stay is a resident for purposes of the income tax.  Id. at 268 n.3.

---

[10](...continued)
Sec. 7491(a).  Petitioners do not contend that sec. 7491(a) applies.

[11] In deciding petitioner's residence for 1979, we consider the law then in effect.  Sec. 7701(b) was enacted in 1984 effective for taxable years beginning after Dec. 31, 1984. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 138, 98 Stat. 672.

The term "residence" and "domicile" are not synonymous; however, to be a resident, the taxpayer must have some degree of permanent attachment to the country of residence. Park v. Commissioner, 79 T.C. 252, 287 (1982), affd. without published opinion 755 F.2d 181 (D.C. Cir. 1985). An individual may be a resident of the United States without terminating his or her residence in another country. Id. at 287-288.

2. Whether Petitioner Was a Resident of the United States in 1979

Petitioner argues that the following establish that he was a U.S. resident from 1969 through the years at issue: (a) He was issued a green card in 1965; (b) he was in the United States from 1969 through 1977 and part of 1979; (c) his parents, brother, and some other family members lived here; and (d) he told some members of his family and friends that he wanted to live in the United States.

a. Petitioner's Green Card

Petitioner argues that the fact that he received a green card and permanent lawful resident status in 1965 shows that he was a resident of the United States from 1969 through the years in issue. We disagree. Issuance of a green card in 1965, when petitioner was about 14 years old, has little or no bearing on whether petitioner was a resident in 1979. For that we look to events which occurred closer to 1979.

One reason that we give little weight to the fact that petitioner had a green card in 1965 is that petitioner, in his dealing with U.S. immigration matters, frequently acted as if he were not a U.S. resident.  First, the record does not indicate that petitioner ever used the green card after his short visit here in July 1965.

Second, petitioner used a student visa issued by the United States to enter the United States in 1969 to attend college. Whatever intent to reside in the United States that petitioner may have had when he obtained a green card in 1965 is clouded by his obtaining a student visa, which authorizes an alien to remain in the United States only as long as necessary to complete a course of study plus 60 days.  Sec. 101(a)(15)(F) of the Immigration and Nationality Act,[12] 66 Stat. 168, 8 U.S.C. sec. 1101(a)(15)(F)(I); see 8 C.F.R. sec. 214.2(f)(5)(iv) (1981).

Petitioner testified that he obtained and used a student visa in 1969 to facilitate leaving Iran to attend college in the United States and to facilitate travel to and from Iran when he

---

[12]  Immigration and Nationality Act (1952), ch. 477, sec. 101(a)(15)(F), 66 Stat. 168; 8 U.S.C. sec. 1101(a)(15)(F)(i) (1970), describes persons qualified for a student visa as:

> an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study consistent with  * * * [requirements set forth elsewhere in the Code]. [Emphasis added.]

did not have his green card.  Despite his explanation, we believe

petitioner's use of a student visa is inconsistent with a claim

that, at that time, he intended to be in the United States other

than as a student.

Third, petitioner entered the United States under a B-1 or

B-2 visa in 1979.  Aliens entering the United States under a B

visa may stay in the United States only temporarily.  Sec.

101(a)(15)(B) of the Immigration and Nationality Act,[13] 66 Stat.

167, 8 U.S.C. sec. 1101(a)(15)(B);[14] 8 C.F.R. 214.2(b)(1976).

Authorities issuing the B visa presumably found[15] that petitioner

qualified for it at the time; i.e., that he was entering the

_____

[13]  Immigration and Nationality Act (1952), ch. 477, sec.
101(a)(15)(B), 66 Stat. 167; 8 U.S.C. sec. 1101(a)(15)(B) (1970),
describes persons qualifying for a B visa as:

>    (15) The term "immigrant" means every alien except
> an alien who is within one of the following classes of
> nonimmigrant aliens–
>
>       *    *    *    *    *    *    *
>
>    (B) an alien (other than one coming for the
> purpose of study or of performing skilled or unskilled
> labor or as a representative of foreign press, radio,
> film, or other foreign information media coming to
> engage in such vocation) having a residence in a
> foreign country which he has no intention of abandoning
> and who is visiting the United States temporarily for
> business or temporarily for pleasure; [Emphasis added.]

[14]  See supra note 9.

[15] See Zacharias v. McGrath, 105 F. Supp. 421, 427 (D.D.C.
1952) (presumption of regularity applies to immigration matters).

United States temporarily, that he had a foreign residence that he had no intention of abandoning, and that he did not enter to, for example, work or study.  See supra p. 9 note 9, p. 19 note 13.

Fourth, petitioner's statement in his application for permanent residence in the United States in 1983 that he "eventually" would like to permanently reside in the United States seems at odds with the proposition that he already was a U.S. resident.

### b.    Petitioner's Years in the United States

Petitioner argues that the fact that he was in the United States from 1969 through 1977 and part of 1979 establishes that he was a U.S. resident in 1979.  We disagree.  Petitioner did not work in the United States, participate in the economy or society, or demonstrate a degree of permanent attachment to the United States.  Park v. Commissioner, 79 T.C. at 287; see Demore v. Kim, 538 U.S. 510, 544 (2003); In re Griffiths, 413 U.S. 717, 722 (1973); Sochurek v. Commissioner, 300 F.2d 34, 38 (7th Cir. 1962), revg. and remanding 36 T.C. 131 (1961).

Petitioners point out that we have held that a taxpayer who entered the United States under a student visa was a U.S. resident.  Siddiqi v. Commissioner, 70 T.C. 553 (1978).  Petitioners contend that this case is like Siddiqi.  We disagree.  The taxpayer in that case interrupted his formal education to

work full time and earn wages for 14 months.  Id. at 557.  His contacts with the economy were greater than those of petitioner. Petitioner obtained a real estate license in Florida, and he considered real estate syndication and viewed real estate while in Boston.   However, he was not employed in the United States from 1969 to 1979, and he did not earn any income in the United States from real estate or any other business activity during those years.  He did not show that he had economic ties to the United States similar to the taxpayer in Siddiqi.

Petitioner traveled to London, Spain, France, and Israel in 1979.  In that year his trips to and activities in the United States were very limited.  He occupied an apartment in New York in December, but he did not show an intent to form ties to the community.  During his time as a student, in Boston, and in New York in 1979, petitioner was not deeply or continuously involved in business, personal, social, or political affairs in the United States.  Cf. Park v. Commissioner, 79 T.C. at 289.

c.  Petitioner's Family Members

It appears from our record that petitioner's parents and brother, Phillip Elghanian, have been U.S. residents since 1978 or 1979.  Petitioner contends that this shows that he was also a resident in 1979.  We disagree.  Petitioner has made other choices, apparently independent of his family.

> d.    Petitioner's Statements to Family and Friends

Petitioner points out that some of his family members and friends testified that he told them in the 1970s that he intended to reside in the United States.  We have no reason to doubt that testimony, but we believe petitioner's actions over the years speak more clearly to his intent than his statements to those witnesses.

> e.    The Petition in This Case

Petitioner signed both petitions which state that he became a U.S. resident in 1982.  We treat those statements as petitioner's admission that he was not a resident of the United States in 1979.  Statements in petitions filed in this Court are binding admissions by a taxpayer absent cogent proof that they are incorrect.  See Beard v. Commissioner, 82 T.C. 766, 768 n.6 (1984), affd. 793 F.2d 139 (6th Cir. 1986); Mooneyham v. Commissioner, T.C. Memo. 1991-178.  Petitioners have not presented cogent proof that petitioner was a resident of the United States in 1979.

3.    Conclusion

We conclude that petitioner was not a U.S. resident in 1979.

C.    Whether Petitioner Is Entitled To Deduct an Expropriation Loss in the Same Amount as That Allowed by Respondent in a Settlement With His Father and Brother

Respondent permitted petitioner's brother and father each to carry forward expropriation losses of $3,868,946 from 1980.  Petitioners contend that his losses were the same as his father

and his brother, and that respondent must treat petitioner and his father and brother consistently.  We disagree.

Tax laws must be applied as uniformly as possible.  See Sunday Lake Iron Co. v. Wakefield Tp., 247 U.S. 350 (1918).  However, the Commissioner is not required to offer a settlement to one taxpayer consistent with that offered to other similarly situated taxpayers, absent proof that a taxpayer has been singled out for adverse treatment based on impermissible considerations such as race or religion, and absent contractual agreements to the contrary.  Estate of Campion v. Commissioner, 110 T.C. 165, 170 (1998), affd. without published opinion sub nom. Drake Oil Tech. Partners v. Commissioner, 211 F.3d 1277 (10th Cir. 2000), and Tucek v. Commissioner, 198 F.3d 259 (10th Cir. 1999); Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 58-59, supplemented by 104 T.C. 417 (1995), affd. 140 F.3d 240 (4th Cir. 1998); Davis v. Commissioner, 65 T.C. 1014, 1022 (1976).

Petitioners contend that respondent is estopped from denying that petitioner is entitled to deduct expropriation losses in the same amount as respondent allowed for his father and brother.  We disagree.  For estoppel to apply to a party, the other party must have reasonably relied to its detriment on the conduct of the estopped party.  Lyng v. Payne, 476 U.S. 926, 935-36 (1986); Heckler v. Cmty. Health Servs., Inc., 467 U.S. 51, 59 (1984).  Petitioner filed his 1986 amended return in 1987, which was

before respondent settled with his father and brother in 2003. Petitioner could not have relied on those settlements when he filed his 1986 amended return. There is no evidence that petitioner relied on any communication by respondent in preparing his 1986 amended return. Finally, it appears from our record that petitioner's parents and probably his brother were U.S. residents by 1979. In his petition, petitioner stated that he became a U.S. resident in 1982. Our record suggests that petitioner did not establish U.S. residence when his father and brother did.

We conclude that estoppel does not apply and that petitioner is not entitled to deduct an expropriation loss in the same amount as that allowed by respondent in a settlement with his father and brother.

D. <u>Whether Petitioner Is Liable for the Addition to Tax and Penalty for Substantial Understatement of Income Tax for 1988 and 1989</u>

For 1988, a taxpayer is liable for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Sec. 6661(a). The amount of the understatement is reduced by amounts attributable to items (1) for which there existed substantial authority for the taxpayer's position, or (2) adequately disclosed on the taxpayer's return or in a statement attached to the return. Sec. 6661(b)(2)(B).

For 1989, a taxpayer is liable for an accuracy-related penalty in the amount of 20 percent of any part of an underpayment attributable to, among other things, a substantial understatement of income tax.  Sec. 6662(a) and (b)(2).  The amount of the understatement is reduced by amounts attributable to items (1) for which there was substantial authority for the taxpayer's position, or (2) adequately disclosed on the taxpayer's return or in a statement attached to the return.  Sec. 6662(d)(2)(B).  The accuracy-related penalty does not apply to any part of an underpayment for which was a reasonable cause and with respect to which the taxpayer acted in good faith.  Sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.

Respondent contends that petitioner is liable for the addition to tax under section 6661(a) for 1988 and the accuracy-related penalty under section 6662(a) for 1989 for substantial understatement of tax.  We disagree.  Petitioner attached a statement (which he titled a "rider") to his 1986 amended return.  Disclosure is adequate under section 6661(b)(2)(B)(ii) if, inter alia, it is made on a statement that includes a caption identifying the statement as disclosure under section 6661.  Sec. 1.6661-4(b) and (c), Income Tax Regs.  The statement and the return were sufficient to apprise respondent that the deduction was for an expropriation loss, its amount, and the potential controversy.  Petitioner did not refer to section 6661 on his

1986 amended return or its attachments. However, a disclosure need not do so if, as here, it clearly puts the Commissioner on notice of the possible controversy. See <u>Schirmer v. Commissioner</u>, 89 T.C. 277, 285-286 (1987); <u>Mitchell v. Commissioner</u>, T.C. Memo. 1994-237, affd. 73 F.3d 628 (6th Cir. 1996).

We conclude that petitioner is not liable for the addition to tax under section 6661(a) for 1988 and for the accuracy-related penalty under section 6662(a) and (b)(2) for 1989 for substantial understatement of tax.

<u>Decisions will be entered under Rule 155</u>.